THOMPSON, Presiding Judge.
Melissa Tankersley Wells ("the mother") and Wesley Tankersley ("the father") were divorced by a November 2013 judgment of the Cullman Circuit Court ("the trial court"). The divorce judgment, among other things, awarded the mother sole physical custody of the minor child born of the parties' marriage, subject to the father's rights of visitation. That divorce judgment was based upon an agreement reached by the parties.
Sometime later, the parties reached another agreement, which formed the basis for a January 2015 modification judgment that increased the amount of time the father could exercise visitation with the child. Although that January 2015 modification judgment made no change with regard to the nature of the parties' custody, it is undisputed that the increased visitation awarded to the father as a result of that judgment meant that the parties shared almost equal parenting time with the child.
*977 In November 2015, the father filed a petition seeking to modify custody of the child and seeking an award of sole physical custody. The mother answered and counterclaimed, seeking to reduce the father's visitation with the child and also seeking an increase in the father's child-support obligation.
The trial court conducted an ore tenus hearing on November 3, 2016. On November 7, 2016, the trial court entered a judgment in which it, among other things, modified custody to award the father sole physical custody of the child and ordered the mother to pay child support. In that November 7, 2016, modification judgment, the trial court also awarded the mother visitation with the child, but it placed restrictions on that visitation award until the mother attended a domestic-violence class and her new husband attended anger-management classes. Although the trial court did not explicitly address the mother's counterclaims seeking a reduction in the father's visitation and an increase in an award of child support, those requests are incompatible with the relief granted by the trial court, and, therefore, we conclude that those claims were implicitly denied. Wellborn v. Wellborn, 100 So.3d 1122, 1126 (Ala. Civ. App. 2012) ; J.D. v. Lauderdale Cty. Dep't of Human Res., 121 So.3d 381, 384 (Ala. Civ. App. 2013). The mother filed a postjudgment motion, which the trial court denied. The mother timely appealed to this court.
The evidence from the ore tenus hearing indicates the following facts. The father testified that the parties married in May 2000, and their child was born in March 2011. The parties divorced in November 2013. At the time of the November 3, 2016, hearing on the merits of this action, the child was five years old and had recently started kindergarten.
The father testified that, following their divorce in November 2013 through June 2015, he and the mother had amicably co-parented the child. The record indicates that, in June 2015, the mother and the child began to live with the mother's then boyfriend, Calvin Dwight Wells ("Wells"). The father stated that, thereafter, he and the mother stopped communicating as well as they had before her relationship with Wells.
The father testified that, in the spring of 2015, he and the mother had planned for the child to attend a school close to the father's house so that he could pick up the child after the father's workday ended at 3:00 p.m. However, the mother, on June 22, 2015, withdrew the child's application for enrollment in that school, and she later enrolled the child in another school that was closer to the mother's home. The father stated that, at approximately the same time, the mother lost her job. The mother denied that she was fired from that employment, and she answered in the negative the father's questions regarding whether Wells had played a part in the termination of her employment. However, the father submitted into evidence text messages between the mother and him that indicated that the mother believed that Wells had interfered in her employment at some point.[1]
The father testified that, during the fall of 2015, the mother temporarily moved out of Wells's home on two occasions and that, on both occasions, she had asked the father to take the child for several days. The father testified that the mother told him that Wells had "kicked her out" and that *978 Wells was controlling and verbally abusive. According to the father, the mother once told him that Wells had "flattened" the tires on her vehicle. The father also stated that the mother had told him that Wells had referred to the child as a "brat" and that the child had to stay in her room a lot in the home the mother and the child shared with Wells.
The mother testified that she had left Wells's home only once, in October 2015, and that she had done so on her own initiative. The mother testified that she moved in with Wells in June 2015 and that, at that time, Wells's three oldest children were living with him. She stated that the stress of that living situation caused her to leave for a short period in October 2015. She denied that Wells had ever kicked her out of the house or that he had been abusive. The mother also denied that she had told the father that Wells was controlling or abusive. The mother testified that she had lived with her mother ("the maternal grandmother") for a few weeks before returning to Wells's home.
In April 2016, the mother and Wells were involved in a confrontation. The father testified that the mother told him that she heard Wells slapping the child on the thigh and that she had attempted to intervene on behalf of the child. According to the father, the mother told him that, when she did so, Wells choked her and pushed her to the floor and that she and the child ran to a neighbor's house for help. The father said that the mother told him that she had been frightened that Wells would kill her during that incident.
Following that incident, the mother filed in the trial court a petition for protection from abuse against Wells. In that petition, the mother stated that on April 10, 2016, Wells had "grabbed [her] hair and face, leaving multiple scratches," and that Wells had "threatened to kill [her] if [she] ever had the police involved." In that petition for protection from abuse, the mother further alleged:
"[Wells] slapped me in the face [five] days prior to this incident in front of my child. He left a very large red handprint on the left side. He has also pulled large quantities of my hair out during a verbal disagreement. In January, he shoved me over a chair and bit my left cheek. He constantly threatens to hit me and tells me I need a man to put me in my place."
The mother did not prosecute the protection-from-abuse action, and it was dismissed. At the hearing on the merits of this custody action, the mother denied that Wells abused her. When questioned about the details of the above-quoted paragraph contained in her protection-from-abuse petition, the mother stated that Wells had unintentionally slapped her in reaction to her having surprised him by hitting him with a towel. The mother admitted that, during one confrontation between Wells and her, Wells had bitten her face. The mother stated that she was unable to recall the details of another incident in which she had alleged that Wells had pulled out some of her hair. With regard to that incident, she stated that Wells had reacted when he had decided their disagreement should end but she would not stop arguing; she stated that she probably should have left Wells alone. The mother denied telling the father that Wells had been abusive toward her.
With regard to the April 10, 2016, incident, in her testimony before the trial court in this action, the mother denied that Wells had hurt the child. She stated that she intervened on the child's behalf by running at Wells "aggressively," but she denied that Wells struck her when she did so. The mother stated at the hearing on the merits of this action that she did not believe that she needed protection from *979 Wells and that the child and Wells had a "good relationship up until-until the end."
Regardless, following the April 10, 2016, incident, the Cullman County Department of Human Resources ("DHR") instituted a safety plan pursuant to which the mother agreed that the child would not be in the presence of Wells or the mother's brother.[2] The father filed a motion for pendente lite custody of the child in this modification action, and the trial court conducted a pendente lite hearing on April 21, 2016. On April 22, 2016, the trial court entered a pendente lite custody order based on an agreement reached by the parties. That April 22, 2016, order directed, among other things, that the parties abide by the January 2015 custody-modification judgment, with the proviso that the mother keep the child out of the presence of Wells and her brother.
The record contains a statement, handwritten and signed by the mother, dated April 28, 2016, in which the mother stated: "I, Melissa Tankersley, agree to give Wesley Tankersley full custody of our daughter ... if I get back in a relationship with [Wells]." The father testified that the statement was the mother's idea and that she wrote and signed it voluntarily. The mother testified that she signed that April 28, 2016, statement after the "temporary hearing" in this action because she felt that if she did not, the father would "do anything" to take custody of the child from her. We note that nothing in the record indicates that the trial court considered that handwritten statement to be binding, but, rather, it appears that it was treated as evidence of the parties' interactions.
Within a few days of signing the April 28, 2016, handwritten statement, the mother reunited with Wells, and she became engaged to him in June 2016. The mother discovered that she was pregnant with Wells's child in August 2016, and it appears that they married soon after that discovery, although the date on which the marriage occurred is not set forth in the record.
The mother testified that she moved into a rental home owned by Wells that is located across the street from Wells's home. She testified that she lives in that rental home when the child is in her custody but that she lives with Wells during periods when the child is with the father.
The mother testified that she wanted the restriction that the child not be around Wells removed. She stated that she did not feel that Wells had physically abused her. The mother further testified that she believed that Wells had changed dramatically in the months between the April 10, 2016, incident and the November 3, 2016, hearing on the father's custody-modification petition. The mother attributed that change to Wells's working "within himself"; she admitted that he had not attended counseling or anger-management sessions. The mother testified that she saw no problem with Wells being around the child. The mother also alleged that the father had been aggressive toward her during their relationship. She also testified that, during one visitation exchange after the parties' divorce, the father had "busted" her lip during a fight between them. The father denied the mother's abuse allegations.
Wells testified during the custody hearing. He stated that he has five children, not including the one with whom the mother was then pregnant. Wells stated that he pays child support only for the oldest three, but he stated that he had allowed the fourth child and the mother of that *980 fourth child to reside in the rental home on his property without paying rent. Wells admitted that he had never seen the fifth child.
The mother and Wells admitted that they were arrested on June 22, 2016, as a result of a confrontation with the mother of Wells's fourth child as that woman moved from the rental home into which the mother now resides when the child is in her custody. The mother admitted that charges related to harassment and striking the woman were pending against her at the time of the November 3, 2016, hearing, and, on her attorney's advice, the mother declined to testify regarding that incident. It is not clear what charges resulting from that incident remained pending against Wells at the time of that hearing.
Wells denied all allegations that he had abused the mother. Wells did not deny that he had bitten the mother once, but he stated that he had never left marks on her. He also stated that he did not recall ever threatening the mother. During his testimony, Wells admitted to "talking rough" to a female DHR social worker who investigated a claim of abuse that resulted after he disciplined one of his three older children, and he admitted that DHR found that incident to be indicated for abuse. Wells admitted that he had not seen his oldest three children since November 2015 and that he had not seen the fourth child since the June 2016 incident.
The father alleged that the mother had moved frequently after the parties' divorce. The record indicates that the mother initially left the marital home to live with the maternal grandmother, that she then moved in with Wells, and that she briefly left Wells's home either once or twice in 2015 to live, temporarily, with the maternal grandmother. The mother and Wells were also separated for two to three weeks following the April 2016 incident.
The father testified that he has resided at the same address for the last 12 years in a 3-bedroom, 2-bath mobile home. The father owns 72 acres of land that is adjacent to properties owned by his mother and his brother. The father testified that his brother has children who are close in age to the child and that his extended family enjoys family activities and attending church together.
The father has had the same employer for the last ten years, and he has health-insurance coverage for the child through his employer. The father stated that he works each day until 3:00 p.m. and that, immediately following the end of his work shift, he picks up the child from school. His mother transports the child to school if he is working. The father testified that if he were awarded custody, he would pay the out-of-district fee and let the child remain in her current school for kindergarten, but that he would move her to the school closer to his home for her first-grade year.
The mother had worked as a dental assistant at two different practices until September 2015, when she quit her employment to manage a chicken farm located on Wells's property.
The trial court, in entering its November 7, 2016, judgment, noted that the divorce judgment had awarded the parties joint legal custody of the child but had awarded the mother "primary physical" custody. The trial court correctly interpreted that custody award as one awarding the mother sole physical custody of the child. § 30-3-151(5), Ala. Code 1975; Smith v. Smith, 887 So.2d 257, 261-62 (Ala. Civ. App. 2003). The trial court further noted that because the January 2015 modification judgment did not modify the custody determination in the divorce judgment, the father was required to meet the standard set forth in Ex parte McLendon, 455 So.2d 863 (Ala. 1984), in order to obtain a *981 modification of custody of the child. See Walker v. Lanier, 180 So.3d 39, 42 (Ala. Civ. App. 2015) ("The law is well settled that '[a] parent seeking to modify a custody judgment awarding primary physical custody to the other parent must meet the standard for modification of custody set forth in Ex parte McLendon.' "); Bishop v. Knight, 949 So.2d 160, 166 (Ala. Civ. App. 2006) (same). The McLendon standard requires that
"the noncustodial parent seeking a change of custody must demonstrate (1) 'that he or she is a fit custodian'; (2) 'that material changes which affect the child's welfare have occurred'; and (3) 'that the positive good brought about by the change in custody will more than offset the disruptive effect of uprooting the child.' Kunkel v. Kunkel, 547 So.2d 555, 560 (Ala. Civ. App. 1989) (citing, among other cases, Ex parte McLendon, 455 So.2d 863, 865-66 (Ala. 1984) (setting forth three factors a noncustodial parent must demonstrate in order to modify custody))."
McCormick v. Ethridge, 15 So.3d 524, 527 (Ala. Civ. App. 2008).
In its November 7, 2016, modification judgment, the trial court found that the father had met the McLendon standard. The mother argues on appeal that the evidence does not support that finding. The mother argues that the "only" evidence before the trial court that might justify a custody modification was the testimony that Wells had "spanked" the child, and she asserts that that evidence was not sufficient to meet the McLendon standard. We do not agree with the mother's characterization of the evidence. Although the mother and Wells minimized how hard he hit or slapped the child, that contact prompted the mother to rush toward him in a manner she characterized as "aggressive[ ]." Further, most of the evidence focused on the nature of the relationship between the mother and Wells. In support of his contention that that relationship involved domestic violence and was not a safe environment for the child, the father presented his own testimony, evidence concerning the mother's petition for a protection-from-abuse order against Wells, and the mother's April 28, 2016, statement indicating she would transfer custody to him if she resumed her relationship with Wells. In her testimony, the mother denied the abuse allegations, or minimized them, saying that some of the alleged abuse was her fault. After seeking the protection-from-abuse order, and while this custody action was pending, the mother resumed her relationship with Wells and became engaged to him shortly thereafter. At approximately the same time she became engaged to Wells, the mother and Wells were involved in a confrontation with the mother of one of Wells's children that resulted in the mother's arrest; charges stemming from that arrest were still pending against the mother at the time of the November 3, 2016, hearing. Wells testified at the hearing and denied the abuse allegations. Although this court did not have the trial court's advantage of observing Wells as he testified, we note that the transcript indicates that some of Wells's testimony appeared to be evasive or defensive.
In its November 7, 2016, modification judgment, the trial court did not make specific findings of fact, although the nature of its visitation award, which was subject to certain restrictions, indicates that it determined that there were issues of domestic violence in the mother's relationship with Wells.[3] Even in the absence of factual findings on the issue of custody, this court must assume that the trial court made the findings necessary to support its judgment, and we are not allowed to reweigh the evidence.
*982 Ex parte Patronas, 693 So.2d 473, 475-76 (Ala. 1997). Although the mother denied that her relationship with Wells was abusive, the trial court, as the trier of fact, was in the best position to resolve the disputes in the evidence. Dickinson v. Suggs, 196 So.3d 1183, 1189 (Ala. Civ. App. 2015). The evidence supports a determination that the mother's relationship with Wells has had issues of domestic violence. The record also indicates that, in spite of an order restricting the mother's visitation with the child that prevented the child from having contact with Wells, the mother has continued her relationship with Wells.
" ' "A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong...." ' Ex parte Perkins, 646 So.2d 46, 47 (Ala. 1994), quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala. Civ. App. 1993) (citations omitted). This presumption is based on the trial court's unique position to directly observe the witnesses and to assess their demeanor and credibility. This opportunity to observe witnesses is especially important in child-custody cases. 'In child custody cases especially, the perception of an attentive trial judge is of great importance.' Williams v. Williams, 402 So.2d 1029, 1032 (Ala. Civ. App. 1981)."
Ex parte Fann, 810 So.2d 631, 633 (Ala. 2001).
The father maintained that the nature of the mother's relationship with Wells, and the resultant lack of stability in the mother's life, constituted a material change in circumstances that warranted a modification of custody, and the evidence supports that contention. The father presented evidence indicating that he has a stable home and employment, as well as nearby family support. The parties reside near each other, and the father testified that, in an effort to provide the child stability, he would pay fees necessary for her to continue in her current school rather than make her change schools midyear. Given the presumption of correctness in favor of the trial court's judgment based on its receipt of ore tenus evidence, we cannot say that the mother has demonstrated that the trial court erred in determining that the father had met the McLendon standard and in granting his petition for a modification of custody of the parties' child.
The mother also argues that the trial court erred in its award to her of visitation with the child. In its November 7, 2016, judgment, the trial court awarded the mother a standard schedule of alternating weekend visitation and one afternoon each week, and it awarded the mother additional visitation periods during holidays and each summer. The mother maintains that the trial court "reduced" her visitation with the child. However, before the entry of the November 7, 2016, modification judgment, the mother had sole physical custody of the child and the father had rights of visitation. Accordingly, there was no earlier award of visitation to the mother that could be reduced.
The mother's argument regarding her purportedly reduced visitation is actually an argument that her custodial periods are shorter than those the father had enjoyed under the previous, January 2015, modification judgment, pursuant to which she had sole physical custody of the child but shared approximately equal parenting time with the father.[4] The mother argues that *983 the visitation award in the November 7, 2016, modification judgment affords her too little time with the child and does not serve the child's best interests. An award to the mother of the same amount of visitation as that enjoyed by the father under the January 2015 modification judgment would allow the parents to continue to share almost equal parenting time; in other words, the effect, in practice, would result in little to no modification of the earlier custodial and visitation arrangement. This court has already affirmed the trial court's determination that a change in custody was warranted under the facts of this case.
Also, in reviewing an award of visitation to a noncustodial parent, this court has held that "[v]isitation, like custody, is a matter that rests soundly within the broad discretion of the trial court, and its determination regarding visitation must be affirmed absent a finding that the judgment is not supported by any credible evidence, and that the judgment, therefore, is plainly and palpably wrong." Cohn v. Cohn, 658 So.2d 479, 482 (Ala. Civ. App. 1994). A trial court determines an award of visitation based on the specific facts of each case, and, in doing so, it is guided by the children's best interests. Carr v. Howard, 777 So.2d 738, 741-42 (Ala. Civ. App. 2000).
In her counterclaim in this action, the mother sought a reduction in the father's visitation under the earlier, January 2015, modification judgment, because, she maintained, the amount of visitation the father enjoyed was "disadvantageous" to the child because the child was, at the time the counterclaim was filed, about to start school. The trial court, in reaching its visitation award, also could have considered the child's being in school, and the resultant need for a more stable schedule, in fashioning its visitation award in its November 7, 2016, modification judgment.
The trial court awarded the mother a fairly standard schedule of visitation with the child. Given the facts of this case and this court's affirmance of the modification of custody, we cannot agree with the mother that the trial court erred in failing to order a visitation schedule that would afford her almost equal parenting time with the father.
As part of her argument on the issue of visitation, the mother also challenges the restrictions the trial court placed on her visitation. In that part of its November 7, 2016, judgment addressing the issue of visitation, the trial court first set forth the standard schedule of visitation awarded to the mother and then stated:
" 'The trial court is entrusted to balance the rights of the parents with the child's best interests to fashion a visitation award that is tailored to the specific facts and circumstances of each individual case.' Nauditt v. Haddock, 882 So.2d 364, 367 (Ala. Civ. App. 2003). 'Once the trial court has identified a particular danger to the health, safety, or welfare of the child, and the record establishes that some restriction on visitation is necessary to protect the child, it must mold its visitation order to target that specific concern.' Jackson v. Jackson, 999 So.2d 488, 494 (Ala. Civ. App. 2007). Based on the evidence presented at trial, the court finds it necessary to place the following restrictions on visitation.
"(i) The mother shall not allow the parties' child to have any contact or communication with [Wells] until such time as Wells has completed DVIP classes through Victim's Services of Cullman.[5 ] Within 30 days of [Wells]
*984 completing the domestic-violence program, the mother shall provide the Cullman County Circuit Court Clerk with a copy of Wells's certificate of completion issued by Victim's Services, and [the child] may thereafter be allowed contact and communication with [Wells], subject to the remaining restrictions found herein. It is further ordered that within 30 days of this order, the mother shall enroll in and timely complete the Batterers Intervention Program offered by Victim's Services of Cullman. Within 30 days of completing the program, the mother shall file with the Cullman Circuit Court Clerk a copy of her program certification of completion.
"(ii) The mother shall not at any time permit her current husband, [Wells], to administer corporal punishment of any sort to the parties' minor child. Any corporal punishment of [the child] may only be administered by the mother or father."
This court has held that a noncustodial parent's visitation rights may be restricted " 'in order to protect children from conduct, conditions, or circumstances surrounding their noncustodial parent that endanger the children's health, safety, or well-being.' " B.F.G. v. C.N.L., 204 So.3d 399, 404 (Ala. Civ. App. 2016) (quoting Pratt v. Pratt, 56 So.3d 638, 641 (Ala. Civ. App. 2010) ). However, a restriction on a noncustodial parent's visitation must not " 'do[ ] more than necessary to protect the children.' " Id. See also Norrell v. Norrell, 473 So.2d 523, 525 (Ala. Civ. App. 1985) ("When justified and supported by the evidence or reasonable inferences therefrom, a trial court cannot be faulted in visitation matters for being reasonably careful in establishing restrictions upon the visitation rights of a parent so as to attempt to assure a young child's safety and welfare.").
The mother maintains that the restrictions on her visitation are unreasonable and are punitive in nature, rather than designed to protect the child. She points out that in Jackson v. Jackson, 999 So.2d 488 (Ala. Civ. App. 2007), this court reversed an award of supervised visitation to the wife, who was the noncustodial parent.[6] That award of supervised visitation had been imposed because the evidence indicated that the wife had used illegal drugs and had allowed her former boyfriend, who also used illegal drugs, to be around the children during her visitation. The main opinion noted that there was no evidence that the children's contact with the former boyfriend had harmed the children. 999 So.2d at 494. However, in reversing the award of supervised visitation, the main opinion stated that, although the award of supervised visitation was an overly broad restriction on the wife's visitation, the trial court, on remand, was free to fashion more appropriate restrictions on her visitation. The opinion concluded:
"[T]he trial court did not tailor the visitation award to the particular dangers at issue. Presumably, the trial court found that the wife's former boyfriend's influence and the wife's purported use of marijuana posed a threat to the best interests of the children. If so, the trial court should have tailored its visitation order to address those concerns, such as by requiring the wife to exercise visitation in the absence of her former boyfriend and by ordering the wife not to expose the children to illegal drug use, activity, or associated conversation. The trial court used overly broad means-supervised *985 visitation-to accomplish those goals."
Jackson v. Jackson, 999 So.2d at 495.
The mother in this case contends that there was no harm to the child shown in this case as a result of her exposure to Wells, and, therefore, she argues, the visitation restrictions imposed by the trial court are too broad. However, the authorities discussing restrictions on a parent's visitation do not require that a child be harmed before a restriction on visitation be imposed. Rather, in those cases in which the courts have considered visitation restrictions, the courts have examined whether there are circumstances that could endanger the child. See, e.g., Jackson v. Jackson, 999 So.2d at 494 ("Once the trial court has identified a particular danger to the health, safety, or welfare of the child, and the record establishes that some restriction on visitation is necessary to protect the child, it must mold its visitation order to target that specific concern."); Pratt v. Pratt, 56 So.3d at 642 (affirming an award of supervised visitation "[b]ecause the trial court reasonably could have concluded that supervised visitation was necessary to protect the children from an unreasonable risk of physical or emotional harm ...."); and Lee v. Lee, 49 So.3d 211, 214-15 (Ala. Civ. App. 2010) (affirming an award of supervised visitation because of the threat that the noncustodial parent might attempt to leave the country with the child).
In April 2016, Wells disciplined the child in a manner that caused the mother to intervene by acting "aggressively" against him. Wells has been deemed "indicated" by DHR for abuse of one of his three oldest children when he disciplined that child, and he has not seen the three oldest children since that incident. The record contains other evidence supporting a conclusion that there is domestic violence in the relationship between the mother and Wells. The record also supports a conclusion that, even with regard to the incident in which Wells disciplined the child, the mother has found excuses for his conduct and minimized it.
In fashioning its restrictions on the mother's visitation, the trial court specified that, until both the mother and Wells attended classes about domestic violence, the child cannot be in contact with Wells. Thereafter, the mother may not allow Wells to use corporal punishment in disciplining the child. Thus, unlike in Jackson v. Jackson, supra, the trial court in this case did not place a broad restriction on the mother's visitation. Rather, it is clear from the language of that part of the November 7, 2016, modification judgment pertaining to visitation that the trial court carefully considered the evidence presented to it, the mother's right to visitation, and the child's best interests. We conclude that, given the facts of this case, the visitation restrictions imposed by the trial court are narrowly tailored to address the issues that pose a danger to the child and that those restrictions do no more than necessary to protect the child. Pratt v. Pratt, supra.
The mother also argues that the trial court erred in determining her child-support obligation. An award of child support is governed by the mandatory application of the Rule 32, Ala. R. Jud. Admin., child-support guidelines. Thomas v. Norman, 766 So.2d 857, 859 (Ala. Civ. App. 2000). Rule 32 requires that the parties submit the child-support forms referenced in Rule 32(E) to the trial court and that the trial court reference those forms in its judgment. In this case, the father submitted a CS-41 income-affidavit form, which is one of the forms required by Rule 32(E). The father also testified regarding his hourly wage, the number of hours he typically worked, and the cost of the health *986 insurance he provided for the child through his employer.
The mother failed to submit any child-support forms to the trial court. She testified regarding her hourly wage at her former employers, but she stated that she had quit her employment to work on the farm owned by Wells.
The trial court did not reference a CS-42 child-support form in its judgment. See Rule 32(E), Ala. R. Jud. Admin. Therefore, the amount the trial court determined constituted the father's gross income and the amount of income it determined the mother earned, or, alternatively, the amount of income it imputed to the mother, are not clear from the record. See G.B. v. J.H., 915 So.2d 570, 574 (Ala. Civ. App. 2005) (holding that a trial court may impute income to a parent, pursuant to Rule 32(B)(5), Ala. R. Jud. Admin.).
" 'The trial court is not bound by the income figures advanced by the parties, and it has discretion in determining a parent's gross income. However, " '[t]his court cannot affirm a child-support order if it has to guess at what facts the trial court found in order to enter the support order it entered....' " Willis v. Willis, 45 So.3d 347, 349 (Ala. Civ. App. 2010) (quoting Mosley v. Mosley, 747 So.2d 894, 898 (Ala. Civ. App. 1999) ).' Morgan v. Morgan, 183 So.3d 945, 961 (Ala. Civ. App. 2014)."
Walker v. Lanier, 221 So.3d 470, 473-74 (Ala. Civ. App. 2016).
Further,
" ' "[t]his court has held that if the record does not reflect compliance with Rule 32(E) ... (which requires the filing of 'Child Support Obligation Income Statement/Affidavit' forms (Forms CS-41) and a 'Child Support Guidelines' form (Form CS-42)), and if child support is made an issue on appeal, this court will remand (or reverse and remand) for compliance with the rule. See Martin v. Martin, 637 So.2d 901, 903 (Ala. Civ. App. 1994). On the other hand, this court has affirmed child-support awards when, despite the absence of the required forms, we could discern from the appellate record what figures the trial court used in computing the child-support obligation. See, e.g., Dunn v. Dunn, 891 So.2d 891, 896 (Ala. Civ. App. 2004) ; Rimpf v. Campbell, 853 So.2d 957, 959 (Ala. Civ. App. 2002) ; and Dismukes v. Dorsey, 686 So.2d 298, 301 (Ala. Civ. App. 1996). Nevertheless, without the child-support-guidelines forms, it is sometimes impossible for an appellate court to determine from the record whether the trial court correctly applied the guidelines in establishing or modifying a child-support obligation. See Horwitz v. Horwitz, 739 So.2d 1118, 1120 (Ala. Civ. App. 1999)." '
" Harris v. Harris, 59 So.3d 731, 736-37 (Ala. Civ. App. 2010) (quoting Hayes v. Hayes, 949 So.2d 150, 154 (Ala. Civ. App. 2006) )."
Wellborn v. Wellborn, 100 So.3d at 1126.
The record in this case does not demonstrate the manner in which the trial court reached its child-support determination, and this court is unable to determine the manner in which the trial court calculated child support. Accordingly, we reverse that part of the judgment pertaining to child support, and we remand the cause for the trial court to set forth its child-support calculations, including its determinations of the parties' gross incomes, using the child-support forms required by Rule 32(E), Ala. R. Jud. Admin. Wellborn v. Wellborn, supra ; Thomas v. Norman, 766 So.2d 857, 859 (Ala. Civ. App. 2000) ; and Martin v. Martin, 637 So.2d 901, 903 (Ala. Civ. App. 1994).
*987 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
Pittman, Moore, and Donaldson, JJ., concur.
Thomas, J., recuses herself.

In one text message to the father, the mother stated that she "refuse[d] to lose another job due to manipulation and abuse." In later text messages, the mother assured the father that she was not accusing the father of manipulating her and that, in making that statement, she had been referring to Wells.

The record indicates that the mother's brother, who lives with the maternal grandmother, has a history of drug abuse.

Those restrictions are discussed in more detail later in this opinion.

To the extent that the mother might be arguing that the trial court erred in failing to award her joint physical custody of the child, as that term is defined in § 30-3-151(3), we note that, in this opinion, we are affirming the award of sole physical custody to the father in the November 7, 2016, modification judgment.

The specific name of the "DVIP" classes is not indicated in the record on appeal.

The main opinion in Jackson was authored by Judge Moore; regarding the issue of visitation in that case, Judge Pittman and Judge Thomas concurred in the result while Presiding Judge Thompson and then Judge Bryan dissented.