Rel:  April 24, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2025-2026

_____

### CL-2025-0941

_____

### David Dudley Crum

### v.

### Michelle Yessick Crum

### Appeal from Lee Circuit Court
### (DR-19-900251.01)


EDWARDS, Judge.

David Dudley Crum ("the father") appeals from a judgment of the

Lee Circuit Court ("the trial court") modifying his visitation with H.C.

("the child").  For the reasons set forth below, we reverse the trial court's

judgment and remand the case for further proceedings.

The father and Michelle Yessick Crum ("the mother") were divorced by a judgment entered by the trial court in November 2019. Pursuant to a marital settlement agreement that was incorporated into the trial court's November 2019 divorce judgment, the mother was awarded sole physical custody of the child and the parties were awarded joint legal custody of the child.[1] The child is the parties' only child as a result of the marriage; the father has three adult children from a previous marriage, who, he stated, were familiar with the child. The November 2019 divorce judgment provided a detailed schedule of the days and times that the father could visit the child and provided the father the right to "private telephone communication" with the child "at all reasonable times and places."

It appears that the father visited the child pursuant to the terms of the November 2019 divorce judgment for approximately six months following its entry. According to the mother, she and the child each attempted to contact the father in the six months after he stopped visiting but did not receive a response. Sometime after that six-month period,

---

[1]The child was born in February 2014 and was five years old at the time of the parties' divorce.

Edward Crum ("the paternal grandfather") and Robert Crum ("the paternal uncle") filed a petition in the Tallapoosa Probate Court ("the probate court") seeking to be appointed joint guardians of the father's person and joint conservators of the father's estate. The record suggests that the paternal grandfather and the paternal uncle believed that the father had serious mental-health issues that impaired his judgment and prevented him from managing his own affairs. In May 2021, the probate court granted the paternal grandfather and the paternal uncle's petition and named them as joint guardians and conservators. The father was permitted to seek to have the guardianship and conservatorship removed after submitting to a medical examination and a psychological examination and providing results of those examinations demonstrating that the father would be capable of managing his own affairs.

Despite the probate court's judgment, in August 2021 the father relocated to Little Torch Key, Florida, and gained access to many of his bank accounts.[2] He did not inform the mother of his relocation. The

---

[2]The father did not visit the child between approximately May 2020, which was six months after the parties' divorce, and August 2021, when the father moved to Florida.

record reveals that the father completed a psychological evaluation in Florida in October 2021and that the father submitted the results of that evaluation to the probate court. The guardianship and conservatorship were removed in June 2022.[3]

In December 2021, the father contacted the mother through e-mail requesting visitation with the child at his new Florida residence. The father stated that the child could meet two of the father's adult children, the child's half siblings, at the Atlanta airport and fly to Florida with them. The mother responded to the father's e-mail, stating that she wanted the child to visit the father but that she was not comfortable with the child's traveling that distance without her or the father accompanying him. She also informed the father that she did not have the father's current address or telephone number. The father made similar requests in February 2022 and July 2022, which the mother also denied.

---

[3]It appears that the paternal grandfather and the paternal uncle initially contested the removal of the guardianship and the conservatorship. It is unclear whether they eventually conceded to the removal of the guardianship and the conservatorship.

In September 2022, the father filed a verified petition in the trial court seeking to modify the visitation schedule set out in the November 2019 divorce judgment and requesting a rule nisi, claiming that the mother had violated the terms of the November 2019 divorce judgment by preventing him from visiting the child. In November 2022, the mother filed an answer to the father's petition and asserted a counterclaim for a rule nisi based on her assertion that the father had failed to reimburse her for certain child-related expenses and had failed to maintain the child on his health insurance as required by the November 2019 divorce judgment.

In November 2023, the trial court entered an order finding that the father had failed to exercise his visitation rights for "an extended period of time" and that "a period of reunification" between the child and the father was required. To that end, the trial court ordered that the father would have visitation with the child in Lee County between 9:00 a.m. and 8:00 p.m. and that the father's visitation would be required to occur "in the presence of a third party of the father's family."[4] In December 2023,

---

[4]The trial court did not specify in its order on what dates the father was to exercise visitation. We presume that the trial court intended, at

the father filed a motion in the trial court requesting that the trial court permit expanded visitation during the Christmas holidays and that the trial court lift the requirement that a paternal relative be present during his visits.[5] The mother filed an objection to that motion.

On February 2, 2024, before the trial court held a hearing or ruled on the father's motion, the father filed another motion asserting that the mother had attempted to prevent the father from reestablishing a relationship with the child by failing to respond to his inquiries regarding visitation dates. The father also requested that he be permitted unsupervised visitation with the child on specific dates in February, including the weekend that the father was to be in Lee County for a February 23, 2024, hearing before the trial court, and that, thereafter, he be permitted to resume his "normal" visitation schedule. The trial court held a status hearing on February 23, 2024, at which the trial court heard arguments concerning the father's request for visitation. During that

_____

a minimum, for the father to exercise his visitation on those dates that he would have had pursuant to the divorce judgment.

[5]The father explained that he did not have a harmonious relationship with the paternal grandfather or the paternal uncle. It appears that the father was engaged in litigation against the paternal grandfather and the paternal uncle throughout these proceedings.

hearing, the trial court reemphasized the need for the father to visit the child and for a third party to be present during the visits to alleviate any anxiety that the child might experience as he resumed visits with the father.[6]  Following the hearing, the trial court entered an order directing the parties to "arrange visitation amongst themselves" before the father returned to Florida and when the father returned for another hearing scheduled for March 8, 2024.

The trial court conducted another status hearing on March 27, 2024, concerning, among other things, the father's request for specific visitation dates.  The mother's attorney reported that the father's first visit with the child following the February 23, 2023, hearing "went relatively well" and that, after experiencing "scheduling issues," the parties had managed to "work[] together without the necessity of attorneys" to ensure that the father was able to continue visiting the child.  The father's attorney echoed the parties' positive conduct and requested that the father be permitted to visit the child without supervision and in Florida for specific periods, including the month of

---

[6]The mother stated that the child was "anxious" and took Adderall "for his anxiety."  It does not appear that the child has been formally diagnosed with any anxiety-related disorders.

7

July. The mother, through her counsel, continued to express her hesitation about permitting the child to travel to Florida for an entire month. She also maintained her concerns that the father might have continued mental-health issues despite the probate court's removal of the father's guardianship and conservatorship. The trial court stated that it did not intend to permit the child to travel to Florida at that time and that it would like the father to visit the child more before it would permit the child to travel to Florida.

On May 3, 2024, the trial court entered an order specifying seven visitation periods in Lee County between April 2024 and June 2024, four of which were to be supervised "by an adult child of [the father] or any other person approved by [the mother]," with the remaining visits to be unsupervised. The order specifically noted that the parties could modify the order to provide additional visitation for the father, including overnight visitation. The father was also permitted "unfettered contact via telephone, text, e-mail, or social media" with the child and was required to initiate telephone or videoconferencing contact with the child at least once each week. In addition, the trial court ordered the father to

submit to a psychological evaluation by a psychiatrist or licensed psychologist in Lee County.

In June 2024, the father filed a motion, again requesting unsupervised visitation with the child or, in the alternative, permitting Bart Casey, a friend of the father who lived in Opelika, to serve as a supervisor. In his motion, the father noted that he had been unable to complete one of his scheduled visits because his adult children were unable to serve as supervisors and that the mother had refused to agree to Casey's serving as a supervisor. The mother objected to the father's motion, asserting that the father had not notified her of his desire to have Casey, with whom she claimed the child was not familiar, supervise a visit until the father and Casey had arrived at the scheduled visit.[7] On September 24, 2024, the trial court held a hearing on the father's motion. At that hearing, the mother asserted that the father had belatedly scheduled his psychological evaluation, that the father had failed to initiate telephone or videoconferencing contact with the child once per week as required by the trial court's May 3, 2024, order, and that the

---

[7]She also asserted that the father had not completed his psychological evaluation.

father had not attended the child's various activities when the father was in Lee County outside of his set visitation periods. The father claimed that he had been unable to schedule a psychological evaluation until August and that he and the child primarily communicated through a messaging app, but that the child "rarely respond[ed]." It appears that the trial court orally authorized Casey to serve as a supervisor but did not enter a written order to that effect.

On November 6, 2024, the father filed a motion requesting that the mother be held in contempt for failing to permit the father to carry out a scheduled visitation on October 26, 2024. In his motion, the father noted that he and Casey, who was to act as a supervisor for the visit, had arrived at "the drop-off location" but that the mother had "failed or refused to appear" with the child. The mother filed a response to the father's motion, claiming that the father had initially refused to confirm who would be supervising the father's visit but had eventually confirmed that Casey would attend the visit as the supervisor.[8] The mother again noted her objection to Casey because, she asserted, the child was not familiar with Casey and the child had expressed his concern to the

_____

[8]The mother also attached documents in support of that assertion.

mother about Casey's supervising the visit.[9]  In an affidavit attached to her motion, the mother acknowledged the trial court's oral acceptance of Casey but stated that she was "uncomfortable" with Casey's acting as a supervisor absent a written order from the trial court.

On December 20, 2024, the trial court held a hearing on the father's contempt motion, which the father was unable to attend due to travel delays.[10]  The parties largely reiterated their positions regarding Casey's ability to act as a supervisor; the record indicates that the child had expressed to the father in a text message that he was uncomfortable with Casey or any nonfamily member supervising the father's visitation.[11]  The trial court orally reissued its authorization that Casey could serve as a visitation supervisor and subsequently entered a written order to that effect.  The trial court also noted that there had been no allegations that

---

[9]It appears that the child had previously met Casey during another visit.

[10]At that hearing, the trial court also considered various other motions not relevant to this appeal.

[11]The child specifically requested that the paternal grandfather, the paternal uncle, or one of the child's half siblings supervise the father's visits.  The mother e-mailed the father on a separate occasion stating that the child had requested that a relative serve as a supervisor.

11

the child would be unsafe with the father and that it had ordered supervised visitation because it had been informed that the child had not seen his father in several years. The child was also appointed a guardian ad litem.

A trial on the father's modification petition was held on June 4, 2025. The testimony of both parties largely recounted the history set out above. In addition, the father testified that he had visited the child in January 2025 and February 2025 but that the parties had been unable to agree on visitation dates for March, April, and May 2025. The father specifically requested to have visitation with the child for one week during the Christmas holiday, "a week" during the child's spring break, and occasionally throughout the year. He also requested that the child visit him for the month of July in Florida. The father stated that he would be willing to fly to Lee County for weekend or short-term visitation periods but that he would prefer the child to come to Florida for longer visits.[12] The father acknowledged that he would likely be able to financially afford to fly to Atlanta for weekend visits with the child in Lee

---

[12]The father indicated that he was willing to fly to Atlanta, pick up the child, and fly back to Florida for longer visits.

County five or six times each year. The father also admitted that he "was not in a real good spot in [his] life" after the parties' divorce and that he had "started doing a lot better" after moving to Florida.

The father conceded that he did not know the last time that he had called the child on the telephone.[13] The father's testimony generally indicates that he had requested various dates for visitation and had repeatedly attempted to secure overnight or weekend-long visitation, that the mother had not accepted those requests, and that the parties had failed to reach a consensus regarding visitation or to adequately communicate. The father testified that Casey's residence, in which he stayed when he was in Lee County, had an available bedroom for the child to use, provided that Casey's adult children were not visiting at the same time. The father also testified that he believed that his visits with the child had been positive and that he had tried to engage in activities that the child enjoyed. It also appears that the father had been able to exercise unsupervised visitation with the child pursuant to the trial court's May 3, 2024, order.

---

[13]The record indicates that the father's last text message to the child was sent on May 27, 2025.

The mother's testimony indicates that the parties had difficulties communicating and reaching an agreement regarding the father's visits. The mother stated that she believed that it would be helpful for the trial court to order a specific visitation schedule. She also stated that she believed that it would be "a very bad idea right now" for the child to visit the father in Florida based on the mother's perception of the child's relationship with the father and "the amount of time [that] [the father and the child] have spent here in Lee County." She also stated that she would not feel comfortable sending the child to Florida until the father had "more successful visits [in Lee County] so [the child] feels comfortable going." The mother opined that she would want between 5 and 10 more successful visits before she would consider sending the child to Florida. According to the mother, the child had indicated that he did not want to have overnight visitation with the father and that he did not want to travel to Florida.

The mother testified that the child had maintained a relationship with the paternal grandfather and the paternal uncle. She also stated that she did not have an issue with the child's being around his half siblings. Regarding Casey, the mother testified that she knew Casey and

that he was "someone that [she] would speak to if [she] saw him in public," but she asserted that she did not consider him to be a friend; she also said that Casey's role as a visitation supervisor "created another level of anxiety" for the child. The mother's testimony also indicates that the father had had two-day, unsupervised visits with the child in January and February 2025. The mother explained that, during the February 2025 visit, the child had called her from Baumhower's Victory Grill, a restaurant, and had asked her to pick him up. According to the mother, the child was upset at being "unsupervised for an extended period of time."[14]

After the parties had testified, the guardian ad litem recommended that the father exercise a minimum of four visits per year in Lee County for "an extended period of time" before exercising overnight visitation or visits to Florida. The trial court noted that the father had not made as much progress toward "reunification" with the child as it had hoped and that he had failed to take full advantage of the opportunities the trial court had provided him. The trial court also stated that the parties had

---

[14]It appears that the child was upset that the father had brought the child to Baumhower's so that the father could watch sports with his friends during his visit with the child.

difficulties communicating and coming to an agreement on visitation matters.

The trial court concluded the trial by issuing its judgment regarding the modifications to the father's visitation from the bench. Notably, the trial court awarded the father six specific three-day weekend visits each year to be exercised in Lee County. The trial court restricted those visits to between 8:00 a.m. and 9:00 p.m. because, the trial court explained, it did not want the child to stay at a house owned by a friend of the father or in a hotel. The trial court entered its written judgment on June 10, 2025, modifying certain provisions of the November 2019 divorce judgment pertaining, in relevant part, to the child's visitation. As discussed above, the father was awarded six specific three-day weekend visits each year. The trial court specifically stated that "th[ose] visits will not include overnights" and would take place between 8:00 a.m. and 9:00 p.m. on each day of each weekend visit. The trial court maintained the father's Christmas holiday and "spring break" holiday visitations from the divorce judgment.[15] The father was awarded

---

[15]The father was encouraged but not required to have one of the child's half siblings present for the Christmas holiday visit if that visit took place in Florida.

16

summer visitation with the child between July 2 and July 7, 2025; one of the child's half siblings was required to be present during that visit. The trial court ordered that all subsequent summer visits occur between June 29 and July 12; no requirement was made for any of the child's half siblings to be present for summer visitations after 2025.

On July 10, 2025, the father filed a postjudgment motion challenging, in relevant part, the trial court's prohibition on overnight visitation with the child during his weekend visits as an unnecessary burden on his visitation rights. The trial court scheduled a hearing on the father's postjudgment motion for September 30, 2025. No transcript of that hearing appears in the record, and the father's postjudgment motion was denied by operation of law on October 8, 2025. See Rule 59.1, Ala. R. Civ. P. The father timely appealed.

On appeal, the father challenges the trial court's modification judgment insofar as it prohibits him from exercising overnight visitation with the child during his weekend visits.[16]

> "'This court has held that a noncustodial parent's visitation rights may be restricted "'in order to protect children from conduct, conditions,

---

[16]The mother did not file an appellee's brief responding to the father's argument.

or circumstances surrounding their noncustodial parent that endanger the children's health, safety, or well-being.'" B.F.G. v. C.N.L., 204 So. 3d 399, 404 (Ala. Civ. App. 2016) (quoting Pratt v. Pratt, 56 So. 3d 638, 641 (Ala. Civ. App. 2010)). However, a restriction on a noncustodial parent's visitation must not "'do[] more than necessary to protect the children.'" Id. See also Norrell v. Norrell, 473 So. 2d 523, 525 (Ala. Civ. App. 1985) ("When justified and supported by the evidence or reasonable inferences therefrom, a trial court cannot be faulted in visitation matters for being reasonably careful in establishing restrictions upon the visitation rights of a parent so as to attempt to assure a young child's safety and welfare.").'

"Wells v. Tankersley, 244 So. 3d 975, 984 (Ala. Civ. App. 2017). Although a trial court has broad discretion over the issue of visitation, a noncustodial parent should be given the opportunity to maintain a meaningful relationship with his or her child. Carr v. Broyles, 652 So. 2d 299, 303, 304 (Ala. Civ. App. 1994)."

Lester v. Lester, 378 So. 3d 555, 567 (Ala. Civ. App. 2022).

The father relies heavily on our decision in Lester to support his argument on appeal. In Lester, which was also an appeal from a judgment of the Lee Circuit Court, the trial court modified a father's visitation to preclude overnight visitation and extended summer or holiday visitation despite the lack of evidence in the record indicating that overnight visitation posed a peculiar danger to the children in that case. We explained that

18

"'if a … judgment is modified to limit a parent's visitation based on misconduct, the limitation ordered must be supported by evidence that the misconduct of the parent is detrimental to the child.' Carr [v. Broyles], 652 So. 2d [299,] 304 [(Ala. Civ. App. 1994)]. Although we do not hold that a trial court cannot place limits on a parent's visitation unless the children involved have first suffered harm a result of the parent's misconduct, the record must disclose that the limitations imposed on a parent's visitation are to protect the children from anticipated harm resulting from the noncustodial parent's behavior."

378 So. 3d at 568. We concluded that, because the record in Lester demonstrated that the children in that case did not have a fear of that father and desired to resume normal visitation with him, and because no evidence indicated that the father's misconduct had been directed at or occurred in the presence of the children, the trial court's visitation restriction was not supported by the evidence. The father argues that the record in the present case lacks any evidence indicating that overnight visitation posed a peculiar danger to the child and that, because the trial court also awarded him unsupervised, multiple-day visits with the child in Florida, the trial court's judgment is internally inconsistent. We agree.

Nothing in the record suggests that the father posed a danger to the child or would suggest that the prohibition on overnight visits during the

weekend visits is warranted. Although the mother testified that the child was "anxious" about visits with the father and the potential of staying with the father overnight, the trial court's judgment clearly indicates that the trial court did not give that testimony much weight. The trial court explicitly awarded the father unsupervised visits in Florida for periods exceeding a week, and those visits necessarily require the child to stay with the father overnight. Although the trial court expressed reservations about the child's staying in a house owned by a friend of the father or in a hotel during the weekend visits, nothing in the record supports a conclusion that the father's exercising his visits by staying in a house owned by a friend or in a hotel with the child overnight would place the child's well being at risk. Because the record does not contain evidence indicating that the exercise of overnight visitation by the father during weekend visits in Lee County would present any risk to the child, the trial court's restriction on the father's weekend visits does not serve to ameliorate any potential danger to the child.[17] Thus, the trial court's prohibition on overnight visitation during the father's weekend visits in

---

[17]We note that the trial court did not prohibit the father from having his friends present when the child was in his care.

Lee County exceeded the trial court's authority and cannot be affirmed. See Pratt v. Pratt, 56 So. 3d 638, 641 (Ala. Civ. App. 2010).

We conclude that the trial court's prohibition on overnight visitation during the weekend visits in Lee County is overly broad and an abuse of the trial court's discretion. Accordingly, we reverse that part of the trial court's judgment, and we remand the case for the entry of a judgment consistent with this opinion.

REVERSED AND REMANDED.

Moore, P.J., and Hanson, Fridy, and Bowden, JJ., concur.