THOMPSON, Judge.
On April 11, 2002, D.V. (“the father”) filed a petition for the determination of custody of J.T.T.V. (“the child”) in the Marshall Juvenile Court (“the trial court”). In his petition, the father alleged that the child was living with the maternal grandparents and that J.M. (“the mother”) had very limited contact with the child. Shortly after the father filed his petition, the trial court entered an ex parte order in which it ordered that the child continue to live with the maternal grandparents, subject to visitation by the father, and appointed a guardian ad litem to represent the interests of the child. On April 15, 2002, the mother answered, pro se. On April 30, 2002, the mother, then represented by an attorney, filed a second answer and a counterclaim seeking custody of the child.
On August 19, 2002, the trial court ordered genetic testing. The results of that test established the father’s paternity of the child. The trial court also named a court appointed judicial advocate (“CAJA”) to investigate and to prepare a report. The trial court held a final hearing on March 7, 2003, and on March 25, 2003, it entered a judgment awarding joint custody of the child to the mother and the father with the father having primary physical custody of the child. The judgment ordered the mother to pay to the father $85.56 per month in child support. The mother appealed.
The child was born on November 20, 1997. The father was present in the hospital when the child was born. The mother testified that she did not put the father’s name on the birth certificate even though she knew he was the child’s father. The father testified that he believed the child was his when the child was born. The mother and the father never married. The record indicates that the father has been involved with the .child since the child’s birth.
At the time of the hearing in this matter, the child was 5 years old; the child was not enrolled in kindergarten and had not attended any preschool program. According to the mother, she attempted to enroll the child in a preschool program but the child was not accepted. The mother testified that the child stays at the home of the maternal grandparents during the day while the mother works. The maternal aunt, who resides in the maternal grandparents’ house with her two children, testified that she keeps the child. According to the maternal aunt, the child watches cartoons the majority of that time.
The mother is employed full-time with Genesis Manufacturing. The mother shares an apartment with her husband, B.M., her eight-year-old daughter from a prior relationship, and the child; the mother and B.M. have been married for approximately four years. B.M. is employed full-time.
B.M. testified that he has been arrested multiple times. During the course of the marriage, B.M. was arrested twice following incidents of domestic violence involving the mother. Arrest records, attached to the CAJA report admitted into evidence at the hearing, and B.M.’s testimony reveal that on June 16, 2001, B.M. was arrested after he grabbed the mother’s neck and refused to let her out of his vehicle. The mother sustained a cigarette burn to her right midsection and a bruise on her right rib cage during that incident. The mother testified that she did not press charges against B.M. and did not go to court on the assigned court dates. According to the mother, the child was staying with the father at the time of that incident.
On February 14, 2002, B.M. was arrested a second time for domestic violence. *626 The mother testified that she and B.M. were “scuffling” when she fell down and suffered an injury to her left jaw; the mother was admitted to the hospital as a result of her injury. According to the mother, both she and B.M. had been drinking before the incident. The mother testified that she did not pursue the prosecution of B.M. relating to that incident. The mother stated that the child was staying with the maternal grandmother at the time of the February 2002 incident. B.M. denied that he ever hit the mother, but he admitted that he had pushed her several times during the course of the parties’ marriage. B.M. testified that he had never been convicted of a crime.
The mother testified that B.M. was a good role model for the child. The mother denied that B.M. was physically violent or abusive and testified that B.M. did not curse. B.M. testified that the parties had only separated once, for a period of three months, during their four-year marriage. The mother testified that the child has never been present when she and B.M. were arguing or fighting. According to the mother, she offers a safe environment for the child, and, therefore, she argues, she should receive custody of the child.
The mother testified regarding an incident on February 13, 2003, during which the maternal grandmother attempted to take the child from the mother’s mobile home. According to the mother, the maternal grandmother broke a window in the mobile home in an effort to get to the child. The maternal grandmother testified that she “lost her cool” when the mother and B.M. would not let her in the mobile home to see the child. The maternal grandmother was subsequently arrested for domestic violence.
The father is originally from Mexico, but he has lived in the United States for the past 12 years. According to the father, he is a legal resident of the United States, and he plans to apply for United States citizenship in 2004. He does not intend to move back to Mexico. The father is self-employed in the masonry business; he has owned his own business for the past three years. The father lives in an apartment with his wife; the father and his wife have no children.
The father testified that after the child was born the maternal grandparents allowed him to visit the child. The mother testified that the father visited with the child every other weekend and that she did not object to the visitation. The mother testified that she prevented the father from taking the child for visitation only twice. According to the mother, she prevented the father from visiting the child when he had threatened to take the child to Mexico.
The father filed for custody of the child when the child was four years old. The father testified that, as the child got older, he grew concerned about the way the child was being raised. The father stated that he rarely saw the mother with the child. The father testified that the maternal grandfather informed him that the child was living with him and the maternal grandmother. The mother testified that the child lived with her and B.M. but that the father would typically pick the child up at the home of the maternal grandparents for visitation before the mother had an opportunity to pick the child up after she got off work. According to the mother, the child has lived with her continually with the exception of six months when the child lived with the maternal grandparents after the mother and B.M.’s house flooded.
The mother testified that she received no child support from the father after the child was born. According to the father, he barely made enough to survive before he filed for a custody determination. The *627 father testified that he occasionally contributed money towards the purchase of clothes and diapers for the child. According to the mother, the father started giving her money for the child only six months before the hearing in this matter. The father stated that during the two years before the hearing, he had given the maternal grandparents $50 per week for the care of the child when he was financially able. According to the father, the mother never asked him for child support and the mother never sought a court order requiring him to pay child support. The mother testified that her financial situation had been “poor” since the child was born.
The father testified that his immediate family lives close by and that the child frequently plays with the father’s younger nieces and nephews. The father testified that he takes the child swimming and plays soccer with the child during his visitation. The child also attends church with the father. According to the father, the child shows an interest in attending school. The father expressed concern that the child was not yet in a preschool program. The father testified that if he were to receive custody of the child, he would immediately enroll the child in a preschool program.
David Pendergrast, a CAJA volunteer, testified that he received the case for review after A1 Almador, another CAJA volunteer, was removed from the case at the request of the mother for alleged bias. Pendergrast testified that he reviewed the material prepared by Almador and interviewed the mother, the father, the maternal grandparents, and the maternal aunt. In an addendum to AJmador’s CAJA report, Pendergrast determined that the findings and report prepared by Almador were accurate and he adopted those findings. The CAJA report prepared by Al-mador recommended that custody of the child be awarded to the father. At the end of the hearing, the guardian ad litem recommended that the child be placed in the custody of the father and that the mother and the maternal grandparents have liberal visitation. Both the CAJA and the guardian ad litem concluded that the child was in need of structure and stability and that the current custody arrangement did not promote those needs.
On appeal, the mother argues that the trial court erred in awarding the father primary physical custody of the child. Specifically, the mother contends that custody of the child should not have been awarded to the father because the father failed to pay child support before filing for a custody determination. The determination of an award of custody is within the sound discretion of the trial court. Pierce v. Helka, 634 So.2d 1031 (Ala.Civ.App.1994). A trial court’s custody determination following the presentation of ore tenus evidence is presumed correct and will not be reversed absent a finding that the trial court abused its discretion or that its determination is so unsupported by the evidence as to be plainly and palpably wrong. Pierce v. Helka, supra.
When the trial court makes an initial custody determination, neither party is entitled to a presumption in his or her favor, and the “best interest of the child” standard will generally apply. Nye v. Nye, 785 So.2d 1147 (Ala.Civ.App.2000). In the instant case, the parties agreed to an informal custody arrangement whereby the mother would have physical custody of the child and the father would have liberal visitation; however, there was no prior judicial determination with regard to the custody of the child. Therefore, this is an initial custody determination.
When there is a prior custody judgment, the party seeking a change in custody must meet the standard set forth in Ex *628 parte McLendon, 455 So.2d 863 (Ala.1984); however, if custody has not previously been determined, then the appropriate standard to apply is “the best interest of the child.” Ex parte Couch, 521 So.2d 987, 989 (Ala.1988). See also Ex parte Johnson, 673 So.2d 410, 413 (Ala.1994)(“If neither parent has previously been given primary physical custody, then the ‘best interests of the child’ standard applies.”); Fitzhugh v. Fitzhugh, 634 So.2d 565 (Ala.Civ.App.1994)(where there was no judicial determination favoring one parent regarding physical custody, the best-interests standard applied); Mardis v. Mardis, 660 So.2d 597 (Ala.Civ.App.1995)(because there was no prior determination regarding physical custody, the best-interests standard applied).[1]
A trial court may consider, in making an initial award of custody based on the best interests of the child, factors such as the “ ‘characteristics of those seeking custody, including age, character, stability, mental and physical health ... [and] the interpersonal relationship between [the] child and each parent.’ ” Graham v. Graham, 640 So.2d 963, 964 (Ala.Civ.App.1994) (quoting Ex parte Devine, 398 So.2d 686, 696-97 (Ala.1981)). Likewise, it is important for the trial court to consider such factors as “ ‘the children’s age and sex and each parent’s ability to provide for the children’s educational, material, moral, and social needs.’ ” M.S.H. v. C.A.H., 829 So.2d 164, 168 (Ala.Civ.App.2002) (quoting Graham, 640 So.2d at 964).
The mother and the father are both employed and work primarily during the day. The child, who was five years old at the time of the hearing, is not enrolled in a preschool program. The child, according to testimony, spends much of the day watching cartoons in the care of the maternal aunt. The father testified that the child had expressed an interest in attending preschool and that he plans to enroll the child in preschool. While in the custody of the father, the child participates in sports and attends church.
The mother is married to B.M.; B.M. has an extensive arrest record. The mother has had B.M. arrested twice for domestic violence; she was physically injured each time as a result of B.M.’s violence. The mother declined to prosecute B.M. and stayed with B.M. despite his violent behavior. The record on appeal also reveals that the maternal grandmother, who helps care for the child during the week, had exhibited inappropriate behavior when she broke a window in an attempt to remove the child from the mother and B.M.’s mobile home.
The father has regularly visited the child since the child was born. According to the father, he could not afford to pay child support to the mother after the child was born; however, the father testified that during the two years before the hearing he had given the grandparents approximately $50 per week as child support when he was financially able. The father gave the money to the grandparents because he said he believed the child was living with the grandparents. The mother contends on appeal that the father refused to financially provide for the child; however, the father testified that the mother never asked him for child support. While a parent’s responsibility to support his *629 child financially should be understood, and while this court certainly does not condone the father’s failure in this regard, the payment of child support only intermittently is not dispositive of whether it is in a child’s best interests to be placed in the custody of that parent.
In the instant case, the father paid child support as his financial situation improved. Although the father did not consistently pay child support, the father did consistently visit the child and actively participate in the child’s life. A parent’s failure to pay child support is one factor for the trial court to consider in determining custody. Given other factors, such as the mother’s abusive relationship with B.M., the child’s educational needs, and the recommendations of the CAJA and the guardian ad litem, we cannot say that the trial court abused its discretion in awarding primary physical custody to the father. See M.S.H. v. C.A.H., supra.
The mother also contends that the trial court committed reversible error when it considered the CAJA report prepared by A1 Almador in light of his alleged improper conduct, his possible bias, and the alleged inadmissible hearsay contained in the CAJA report. The mother argues that her substantial rights were adversely affected by the admission of the CAJA report and by the trial court’s consideration of that report in its custody determination. The mother relies solely on Rule 45, Ala. R.App. P., in support of her argument that the CAJA report injuriously affected her substantial rights. Rule 45, Ala. R.App. P., provides, in pertinent part:
“No judgment may be reversed or set aside ... for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected the substantial rights of the parties.”
The record indicates that the mother requested that the trial court remove Al-mador as the CAJA after Almador informed the mother that he had attempted to rent a house to the father. Almador did not rent a house to the father upon the advice of his superiors. Following a February 7, 2002, hearing, the trial court removed Almador and appointed a new CAJA out of an abundance of caution. At the close of testimony at the March 7, 2003, hearing, the trial court overruled the mother’s objection to the admission of the CAJA report prepared by Almador and later adopted by Pendergrast, stating that it had not yet reviewed the report.
The CAJA report prepared by Almador, like the testimony offered at the March 7, 2003, hearing, detailed the history of domestic violence within the home of the mother and B.M. The report also addressed the child’s educational needs and his time spent with the mother, the father, the maternal grandparents, and the maternal aunt. The CAJA report also contained information that was not elicited through testimony at the hearing. Almador visited the homes of the mother, the father, and the maternal grandparents. During those visits he noted the condition of the homes and concluded that the home of the maternal grandparents was inadequate to meet the needs of the child; that the best interests of the child would not be served by placement in the mother’s home because of the multiple incidents of domestic violence involving B.M. and the mother; and that the father’s home offered a clean and safe environment for the child.
Pendergrast testified that he had visited the homes of the mother, the father, and the maternal grandparents. Although Pendergrast did not detail his observations from the visits in his written report to the *630 trial court, he did adopt the CAJA report prepared by Almador, and he concluded that the father could provide a more stable and structured home environment for the child.
Contrary to the mother’s assertion on appeal, we cannot say that her substantial rights were violated by the admission of the CAJA report into evidence at the close of the hearing. The CAJA report consisted primarily of information that was elicited through testimony at the hearing. Both Almador and Pendergrast observed the conditions of the parties’ homes. Although specific testimony regarding the condition of the homes was not elicited at the hearing, Almador’s report detailed those conditions and Pendergrast adopted Almador’s findings as his own after interviewing the parties in their respective homes. The parties interviewed during Almador’s investigation testified at the hearing. Indeed, Almador was present and willing to testify at the hearing; however, the mother declined to call him as a witness to question his alleged bias. In light of the foregoing, we cannot say that the trial court erred by admitting the CAJA report as evidence for consideration in its custody determination.
The mother further contends that the trial court erred in determining her child-support obligation absent the submission of the forms required pursuant to Rule 32(E), Ala. R. Jud. Admin., and absent any evidence of the parties’ income.
“[T]his court has consistently held that the application of Rule 32 is mandatory in child-support actions filed on or after October 9, 1989. A trial court may deviate from the child-support guidelines in determining a child-support amount; however, any deviation' is improper if it is not justified in writing. In Martin v. Martin, 637 So.2d 901, 902 (Ala.Civ.App. 1994), this court issued the following directive:
“ ‘We hold, therefore, that the word “shall” in Rule 32(E), Ala. R. Jud. Admin., mandates the filing of a standardized Child Support Guidelines Form and a Child Support Obligation Income Statement/Affidavit Form.’
“Compliance with Rule 32(E) is mandatory, even though the trial court may find that the application of the guidelines would be unjust or inequitable. When the court determines that application of the guidelines would be manifestly unjust or inequitable, and then deviates from the guidelines in setting a support obligation, the court must make the findings required by Rule 32(A)(ii), Ala. R. Jud. Admin. When Rule 32(E) has not been complied with and child support is made an issue on appeal, this court may reverse the judgment of the trial court and remand the case for further proceedings in compliance with Rule 32.”
Thomas v. Norman, 766 So.2d 857, 859 (Ala.Civ.App.2000)(some citations omitted)(emphasis added).
The record on appeal does not contain a CS-41 income-statement/affidavit form or a CS^42 child-support-guidelines form for the father or the mother. Neither the mother nor the father testified regarding their income, although both parties testified that they were employed. We are unable to ascertain how the trial court reached its child-support determination. Therefore, this court must reverse that part of the judgment of the trial court addressing the issue of child support. We must remand the case to the trial court to require the mother and the father to submit the required child-support forms reflecting their income at the time of the March 25, 2003, judgment. The trial court is instructed to determine child support in *631 compliance with the Rule 82 child-support guidelines or to state the reasons for its deviating from those guidelines. See Thomas v. Norman, supra.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
YATES, P.J., and CRAWLEY and PITTMAN, JJ., concur.
MURDOCK, J., concurs in the result.

. We note that the application of the McLen-don standard is not limited to instances in which there has been a prior custody determination; it is also appropriately applied when a trial court finds that a parent has voluntarily relinquished custody of the child. Ex parte Couch, 521 So.2d 987 (Ala.1988). The trial court made no findings that the father had voluntarily relinquished custody of the child in the instant case.