THOMPSON, Presiding Judge.
On May 16, 2011, the Etowah Juvenile Court entered an order that, among other things, awarded custody of A.B. (“the child”) to S.O. and N.O. (“the maternal grandparents”) and suspended the visitation rights of the mother, C.O. (“the mother”). The mother timely appealed.
The record indicates that the mother was a foster child; when she was approximately eight years old, she was adopted by the maternal grandparents. S.O., the maternal grandfather, testified that the mother had been diagnosed with an attachment disorder and that, as a result, she had experienced behavioral and emotional issues as a teenager. The maternal grandfather testified that the mother’s behavior had often been violent. From the time she was 13 years old until she was 18, the mother lived in a series of group and therapeutic homes.
The mother and the child’s father, K.B. (“the father”), never married. The mother was 19 years old when the child was born. In September 2008, the Etowah County Department of Human Resources (“DHR”) initiated a dependency proceeding, seeking an award of custody of the child, who was then only two months old, because of an incident of domestic violence between the mother and the father. The juvenile court declared the child dependent and awarded custody of her to DHR. DHR placed the child with the maternal grandparents. Pursuant to a number of dependency review orders, the child has remained in the legal custody of DHR and in the maternal grandparents’ home since September 2008.
On January 5, 2011, the mother filed a petition seeking the return of custody of the child. Neither DHR nor the maternal grandparents responded to that petition. However, at the May 9, 2011, hearing on the mother’s custody petition, the maternal grandparents asserted a claim seeking an award of custody of the child. The mother did not object to the juvenile court’s consideration of the maternal grandparents’ custody claim, and we conclude that that claim was tried by the implied consent of the parties pursuant to Rule 15(b), Ala. R. Civ. P.
On May 16, 2011, the juvenile court entered a judgment awarding custody of the child to the maternal grandparents, denying the mother’s request for visitation “at this time,” and terminating DHR’s contin *462 ued participation in the action.[1] In reaching its judgment, the juvenile court found, among other things, that the mother was unfit. The mother timely appealed that part of the judgment suspending her visitation with the child.
A detailed history of the entire action is not contained in the record. However, court review orders from 2009 indicate that the mother and the father failed to visit the child regularly and that their lives were generally unstable. The mother’s testimony indicated that domestic violence was a continuing issue between the mother and the father even after the child was placed with the maternal grandparents. The mother and the father have separated and reconciled several times.
The mother had another child, a son (“the son”), with the father. In February 2010, the father escaped incarceration and, according to the mother, held her hostage in her home over a weekend.[2] At that time, the son was with other family members. The record indicates that the father was captured and again incarcerated; the father was in prison at the time of the May 9, 2011, hearing. The mother testified during the hearing that she had recently decided not to attempt to reconcile again with the father.
The record also indicates that the mother lived briefly with the maternal grandparents, apparently in 2009, and that they had sometimes assisted her financially during the pendency of this action. The maternal grandfather testified that a DHR social worker had asked the maternal grandparents to stop assisting the mother so that the mother could learn to rely on herself and prove that she could properly provide and care for the child.
Diane Stewart, the DHR social worker assigned to the case since January 2011, testified that DHR had recommended in September 2010 that custody of the child be transferred to the maternal grandparents. However, the juvenile court did not accept that recommendation at that time, apparently based on a determination that the mother had made progress toward stability.
The mother testified that she has been in the same home for the last year and a half and that she had maintained employment. The testimony at the hearing, however, established that the mother had changed jobs relatively frequently. The mother was unemployed at the time of the hearing. However, she testified that she had left one job for another and that her orientation at the new job had been interrupted by the April 27, 2011, tornadoes.[3]
The mother testified that, for approximately six weeks in January and February 2011, she had had visitation with the child from Wednesday through Sunday each week. The mother testified that the visitations had gone well and that she believed she was capable of providing for and caring for both the child and the son. That level of visitation stopped after a March 2011 court review hearing. Stewart testified that the mother’s visitation had been *463 reduced because of confrontations between the mother and the maternal grandparents that occurred during visitation exchanges.
The confrontations between the mother and the maternal grandparents continued after the March 2011 hearing. In early April 2011, N.O., the maternal grandmother, and the mother fought about the clothes for the child that each was sending or returning during the mother’s visitation with the child. Stewart, who witnessed that visitation exchange, stated that she believed that the argument was “overdrawn,” and that she lacked sympathy for all the parties involved.
Stewart also witnessed the subsequent visitation exchange, which occurred on April 16, 2011, and she characterized that visitation exchange as having gone well. Stewart testified that, after the mother left with the child at that exchange, she spoke with the maternal grandparents for approximately 30 minutes. Stewart and the maternal grandfather each testified that during that 30-minute conversation they discussed that Stewart had attempted to visit the mother at her home on four or five occasions and had not found the mother at home on any of those occasions. The maternal grandfather testified that the maternal grandparents were concerned about where the mother was staying and whether the child was safe, so they traveled to the mother’s home to check on the child. The maternal grandfather testified that the mother was not at home but that they passed her vehicle on the road, turned around, and returned to the mother’s home, arriving there as the mother arrived in a vehicle with the child, the son, the mother’s best friend, and the husband of the best friend. We note that the mother alleged that the maternal grandparents were following her and that she believed the maternal grandparents were attempting to instigate a confrontation to prevent her from being able to regain custody of the child. Regardless, when the maternal grandparents arrived at the mother’s home, it is undisputed that the mother and the best friend’s husband, C.S., approached the maternal grandparents’ vehicle and began shouting at them. The maternal grandfather testified that when C.S. realized the maternal grandfather was using his mobile telephone to record the encounter, C.S. attempted to punch the maternal grandfather. It is undisputed that C.S. then grabbed the maternal grandfather’s mobile telephone and threw it at the maternal grandparents’ vehicle, breaking the rear-view window on a door of the vehicle. C.S. then fled the scene with the maternal grandfather’s mobile telephone. The maternal grandfather testified that when he later retrieved the telephone the video recording of the confrontation had been erased.
The police were called to the scene, and Stewart later arrived as well. Stewart testified that, given the level of conflict and her concerns about whether the child would be safe if C.S. returned to the mother’s home, she elected to end the visitation and return the child to the maternal grandparents. Stewart testified that the mother was upset at the termination of the visitation and that the mother objected and threw up her arms. At that point, the mother was arrested for disorderly conduct. Stewart testified that she believed that the mother was understandably upset because of the termination of the visitation, and Stewart stated that she had not felt threatened by the mother’s conduct. However, she also acknowledged that she had not witnessed the mother’s conduct before she arrived on the scene, including some conduct that was described in the police report of the incident, which was admitted into evidence at the custody hearing.
*464 Stewart testified that the son appeared frightened during the confrontation. The mother had not taken the child inside or asked her friend to do so during the incident, and, according to Stewart, the child watched the entire incident but did not seem concerned about it. Stewart speculated that, given the child’s lack of reaction to the incident, the child had witnessed a number of such incidents between the mother and the maternal grandparents.
We note that, following the mother’s arrest for disorderly conduct, the son was placed with his paternal relatives as part of a safety plan instituted by DHR. The son was still living with those relatives at the time of the May 9, 2011, hearing in this matter. The mother acknowledged that this was the second time the son had been removed from her care; the first time occurred after the February 2010 incident in which the father held her hostage over a weekend.
When asked why C.S. was present during the April 16, 2011, incident, the mother explained that she had just returned from visiting C.S. and L.S., her best friend. The mother acknowledged that DHR has an open investigation on L.S. and her family, but the mother stated that she understood that the investigation was to end soon. The mother testified that C.S. is not the father of L.S.’s children, and she acknowledged that the father of L.S.’s children had committed domestic violence against L.S. The father of L.S.’s children had been questioned about the death of L.S.’s infant child, which occurred approximately two months before the hearing in this matter; according to the mother, however, that death had been ruled accidental. The mother also stated that she had never exposed the child to the father of L.S.’s children. The mother testified that L.S. married C.S. approximately five weeks before the hearing and that she did not know that C.S. would act in the manner he did during the April 16, 2011, incident. However, the mother acknowledged that she and the son often stayed overnight at the home of L.S. and C.S.; she explained that when she did so, she and the son slept on a bed in the same room as C.S. and L.S. The mother and the son had spent the night in the home of L.S. and C.S. on the night before the incident that resulted in the mother’s being arrested for disorderly conduct.
The maternal grandfather testified that the mother’s conduct during the April 16, 2011, incident was similar to the conduct she had exhibited when she was a teenager. He stated that he did not believe that the mother had made any significant improvement since her adolescence. Stewart testified that she does not believe that the mother and the maternal grandparents can meet for visitation exchanges without conflict. Stewart recommended that, if the juvenile court decided to award custody of the child to the maternal grandparents, there should be no further contact between the mother and the child.
In its May 16, 2011, judgment, the juvenile court found:
“The child was removed from the mother in September 2008 and placed in the legal custody of DHR. The child has been living with the maternal grandparents since that time while efforts to reunify the mother with the child have been ongoing. The maternal grandparents and [DHR] have continually tried to work with the mother and offer support for her. However, the mother’s situation seems to have deteriorated over the last two and a half years and efforts at reunification have failed.
“The mother continues to demonstrate flagrant and consistent emotional disturbances in the presence of her children *465 and apparently lacks either the insight to recognize the negative impact her behavior has on her children or the ability to control her actions. The mother has also associated herself and her children with persons of questionable character who also have ongoing issues with DHR and law enforcement. Recently, the mother was arrested for disorderly conduct as a result of her behavior, and her other minor child, a son, has been removed from her care for a second time and placed with relatives pursuant to a safety plan instituted by DHR. The mother has failed to demonstrate stability in her own life and responsible decision making, and the Court does not feel that she can adequately provide for her own children at this time.
“The Court is clearly convinced that the mother is not a fit and suitable custodian for the minor child. The child has now lived with the maternal grandparents primarily throughout her entire life. They have provided for her physical, emotional, and financial needs. The child has bonded with them, and the Court finds it is in the best interests of the child that the maternal grandparents be awarded her legal custody. The Court is further convinced that any contact between the mother and the minor child at this time would be detrimental to the minor child.”
On appeal, the mother does not challenge the award of custody to the maternal grandparents. The mother argues only that the juvenile court erred by suspending her visitation with the child. The mother argues that the juvenile court’s suspension of her visitation rights in this case was too restrictive.
The determination whether to grant visitation is a matter within the discretion of the juvenile court, and the juvenile court’s principle objective in determining visitation is the best interests of the child. § 12-15-314(a)(4), Ala.Code 1975; Y.N. v. Jefferson Cnty. Dep’t of Human Res., 67 So.3d 76 (Ala.Civ.App.2011); Pratt v. Pratt, 56 So.3d 638, 641 (Ala.Civ.App.2010); and Minchew v. Mobile Cnty. Dep’t of Human Res., 504 So.2d 310, 311 (Ala.Civ.App.1987). This court has explained:
“[T]he guiding principle in determining visitation with a dependent child, or with a child who is the subject of a visitation dispute between parents, is the child’s best interests. Alabama statutory law and caselaw precedent establish that a juvenile court may suspend a parent’s rights of visitation with his or her dependent child if visitation with the parent is demonstrated to be not in the child’s best interests.”
Y.N. v. Jefferson Cnty. Dep’t of Human Res., 67 So.3d at 83.
In this case, the evidence supports the juvenile court’s factual determinations, including that the mother has suffered from emotional disturbances that have had a negative impact on the child.[4] The mother has engaged in consistent confrontations with the maternal grandparents during visitation exchanges, and she indicated during her testimony that she refuses to deal with the maternal grandparents in a manner that would expose the child to less conflict. The juvenile court also determined that the mother has associated with *466 friends who have had problems with DHR and law enforcement, and the mother’s testimony indicates that she has exposed the child to those friends.
However, the record also indicates that the mother has consistently visited the child for a significant period, and that, in the early part of 2011, she enjoyed extended visitations from Wednesdays through Sundays. The record indicates that that visitation was decreased because of continued confrontations between the mother and the maternal grandparents during visitation exchanges. There is no indication in the record that, after the exchanges, the visitations did not go well or that they were detrimental to the child.
We recognize the difficult position in which the mother’s conduct has placed the juvenile court, and we commend the juvenile court for its efforts to protect the child from the mother’s emotional outbursts and inappropriate acquaintances. However, the juvenile court’s discretion in awarding visitation “should be exercised with a view towards the policy of preserving relationships between parents and children whenever possible.” M.R.D. v. T.D., 989 So.2d 1111, 1118 (Ala.Civ.App.2008) (concluding that, given the facts of that case, the suspension of visitation was “overly restrictive”). This court has held that “the trial court may not use an overbroad [visitation] restriction that does more than necessary to protect the child.” Pratt v. Pratt, 56 So.3d at 641. As always, the primary consideration in determining a noncustodial parent’s visitation rights is the best interests of the child; our supreme court has recently reiterated that “[a] trial court in establishing visitation privileges for a noncustodial parent must consider the best interests and welfare of the minor child and, where appropriate, as in this case, set conditions on visitation that protect the child.” Ex parte Thompson, 51 So.3d 265, 272 (Ala.2010).
In this case, we conclude that the juvenile court erred in suspending the mother’s visitation entirely.[5] The juvenile court has available to it a number of less restrictive options for fashioning a visitation award that could adequately protect the child while promoting the relationship between the mother and the child. Those less restrictive options were not explored before the mother’s visitation with the child was suspended. Accordingly, we reverse the juvenile court’s judgment insofar as it suspends the mother’s visitation with the child, and we remand this cause for the juvenile court to award the mother visitation under such circumstances and restrictions as it deems appropriate to protect the best interests of the child. See Carr v. Broyles, 652 So.2d 299, 303 (Ala.Civ.App.1994) (“[T]he primary consideration in establishing the visitation rights accorded a noncustodial parent is always the best interests and welfare of the child.”); Ex parte Thompson, supra.
REVERSED AND REMANDED.
PITTMAN and THOMAS, JJ., concur.
BRYAN, J., concurs specially.
MOORE, J., concurs in the rationale in part and concurs in the result, with writing.

. The mother's petition for custody arose from the dependency proceedings initiated by DHR. Although the visitation issue raised by the mother on appeal primarily implicates the rights of the mother and the maternal grandparents, DHR was a party below, was named in the notice of appeal, and has filed a brief on appeal.

. The record does not indicate the charges upon which the father was incarcerated or for what length of time he was incarcerated.

. We take judicial notice that on April 27, 2011, a series of tornadoes occurred over a great portion of Alabama, causing the deaths of more than 240 people and extensive property damage. The mother lived in an area affected by those tornadoes.

. The mother points out in her brief submitted to this court that the child "appeared unconcerned” during the April 2011 confrontation that resulted in the mother's being arrested for disorderly conduct. Stewart testified that she believed that the child was somewhat accustomed to conflict between the mother and the maternal grandparents. The juvenile court could have properly concluded that it was not in the child's best interests to witness such conflicts or to be accustomed to them.

. We further note that the juvenile court's finding of unfitness, which the mother did not challenge on appeal, does not preclude an award of visitation to the mother. See, e.g., A.M.B. v. 4 So.3d 468 (Ala.Civ.App.2007) (affirming a custody judgment based on a finding of unfitness, but reversing that part of the judgment that failed to set forth a specific schedule of visitation for the mother).