Rel: April 19, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2023-2024

_____

### CL-2023-0338

_____

## L.A.R.

### v.

## J.B.R.

### Appeal from Madison Juvenile Court
### (JU-22-968.01)

HANSON, Judge.

L.A.R. ("the mother") appeals from a judgment of the Madison Juvenile Court ("the juvenile court") that, among other things, found her child, B.L.G. ("the child"), dependent and awarded custody of the child to

J.B.R. ("the stepfather"). The judgment also found the mother in contempt and ordered the mother to pay child support.

The record, stemming from the stepfather's filing of a dependency petition and a subsequent dependency hearing on May 9, 2023, reveals the following facts. The child was born in 2007 of the mother's relationship with R.G. ("the father"). In 2013, when the child was approximately six years old, the stepfather married the mother, who had been awarded sole custody of the child. The child was 16 years old at the time of the May 9, 2023, dependency hearing. The stepfather testified that he had been the child's father figure since he began his relationship with the mother. The stepfather stated that he had never met the father and that, in the time he has known the child, the father had had no contact or relationship with the child.

The mother did not appear at the dependency hearing. At the beginning of the hearing, in response to questions from the juvenile court regarding the mother's absence, the mother's attorney told the juvenile court that she had informed the mother of the date and time of the dependency hearing. The mother's attorney stated that she had had regular contact with the mother until 10 days before the May 9, 2023,

dependency hearing. The mother's guardian ad litem informed the juvenile court that she had attempted to contact the mother through mail and by telephone, but, she said, the mother had never returned those telephone calls or contacted her. The mother's guardian ad litem also represented to the juvenile court that she had attempted to locate the mother through an attorney who represented the mother in a criminal matter, but that that attorney had had no contact with the mother.

The stepfather testified that the mother has been diagnosed with schizophrenia and bipolar disorder. The records from the mother's psychiatrist state that the mother has a "schizoaffective disorder, bipolar type," anxiety, and a sleep disorder that causes insomnia. Some of the records also state that the mother had substance-abuse disorders.

According to the stepfather, the mother managed her mental-health symptoms and medications well until sometime in 2015, when, he said, she began taking stimulant prescription medications. The stepfather explained that, since 2015, the mother has had periods in which she did not take her mental-health medications, specifically lithium, as prescribed and that, beginning in 2015, the mother began self-

medicating by obtaining prescribed stimulant medications, such as Adderall, from various doctors.

The stepfather testified that in 2019, the mother had an episode in which she was in a state of psychosis. During that episode, the mother exhibited paranoid and angry outbursts. The stepfather also stated that, during that episode, the mother made many social-media posts that were angry and/or bizarre in nature. Overall, the stepfather said, the mother's conduct during that episode had caused the child pain and embarrassment.

Evidence in the record demonstrates that another mental-health episode like the one the mother experienced in 2019 occurred in 2021; the mother exhibited similar conduct in both episodes. During the 2021 episode, the mother was hospitalized for approximately two months. In addition, at one point in 2021 when the mother was at home alone and speaking with the child, the mother broke a plate over her own head, causing injury to herself that resulted in another brief hospitalization.

The stepfather described the mother's behavior when she was not appropriately taking her mental-health medications and was "in psychosis" as grandiose; according to the stepfather, she often states that

4

she is a prophet of God or that she receives instructions directly from God. He said that the mother also tends to believe that most women are prostitutes and that many men are frequenting those "prostitutes." When in that state, according to the stepfather, the mother often made 15 to 20 social-media posts per day and was known to send a series of messages through text or social-media sites to the stepfather and the child. The stepfather testified about those social-media posts and messages, and he submitted into evidence voluminous exhibits depicting the mother's social-media posts and her messages to him and to the child. That evidence demonstrates that, when her mental-health condition is not appropriately treated, the mother targets certain people in her life, such as the stepfather, family friends who have been supportive of the child, and a doctor who refused to continue prescribing stimulant medications to the mother, in social-media posts and messages that are rude, that contain false accusations, and that are occasionally threatening. The mother has engaged in fits and "rages" toward the parents of the child's friends or fellow team members. The child is a skilled baseball player. The mother's threatening conduct directed at the parents of other team members has caused the child to be removed from at least one team.

The stepfather is an aerothermal engineer with a government security clearance. The stepfather testified that the mother has threatened to endanger his job and to damage his security-clearance rating. In furtherance of that threat, he said, the mother had made threatening and damaging social-media posts about him on his employer's social-media pages.

In August 2022, the stepfather learned that the mother was having an affair with T.J., who the stepfather described as a local rapper and barber. The stepfather testified that the mother had informed him that T.J. was a member of a gang and that he had been arrested for the distribution of illegal drugs. The mother briefly stopped the affair after the stepfather learned of it. However, according to the stepfather, in late September and October 2022, the mother was in and out of the family home, spending a great deal of her time with T.J. The stepfather testified that in the fall of 2022, the mother missed all of the son's football games.

At some point in November 2022, a divorce action was commenced by one of the parties. No documentation pertaining to the divorce action is contained in the record on appeal.

On November 8, 2022, the mother sent the stepfather a series of texts and social-media messages -- the stepfather estimated he received "hundreds" of messages from the mother that day -- through various platforms in which the mother criticized the stepfather and, among other things, made allegations of inappropriate sexual conduct against him. In addition, in that long series of messages, the mother made many religious statements, claimed to be a prophet, and cursed frequently. Several of the messages could be interpreted as threatening in nature. In response to those communications from the mother, the stepfather filed a motion seeking a protection-from-abuse ("PFA") order, apparently as a part of the divorce action, and, on November 9, 2022, that motion was granted. The November 9, 2022, PFA order required the mother to leave the family home and to have no contact with the stepfather or the child.

It is not clear whether the mother was living at or visiting the family home on November 9, 2022, the day the PFA order was entered. However, on that day, the stepfather called law-enforcement officers for assistance in removing the mother from the family home pursuant to the PFA order. The stepfather testified that although law-enforcement officers led the mother away from the home on November 9, 2022, she

7

returned to the home within 30 minutes and damaged a door frame by kicking in the door to gain access to the family home. The stepfather said that when the mother entered the family home on November 9, 2022, he barricaded himself in a bedroom; he also contacted law-enforcement officers again. He stated that he then heard the mother searching for something in the kitchen. The mother returned to the area outside the bedroom in which the stepfather was barricaded and used a knife to attempt to enter that bedroom. Photographs of the damage the mother made to the outside door and door frame and the bedroom door were admitted into evidence. Law-enforcement officers arrived at the family home before either party sustained any injuries. It is not clear whether the mother was arrested that night or the nature of any charges upon which she might have been arrested. The record contains references to an attorney representing the mother in a pending criminal matter. The child was not present in the home on November 9, 2022.

At approximately the same time as the entry of the November 9, 2022, PFA order, the mother posted on social media claims that T.J. had broken the windows in her vehicle and had injured her with either a large knife or a machete. She also posted photographs of a cut to her head and

8

of her black eye, apparently as proof of her claims against T.J. The mother's relationship with T.J. appears to have ended at or near that time. The stepfather testified that, at the time of the final hearing, the mother was living with a new boyfriend.

On November 16, 2022, the stepfather filed a petition in the juvenile court in which he alleged that the child was dependent as a result of the mother's mental illness. The stepfather sought an award of custody of the child. The juvenile court appointed a guardian ad litem for the child and a separate guardian ad litem to represent the mother.

On January 9, 2023, the juvenile court held a hearing at which the mother was not present. On January 10, 2023, the juvenile court entered an order in which it awarded pendente lite custody of the child to the stepfather and directed the mother to participate in color-code drug screening and to refrain from contacting the child. In that order, the juvenile court specifically stated that any failure by the mother to appear for a scheduled drug screen would result in the juvenile court considering the result of that drug screen to be positive for drugs or alcohol.

Also on January 10, 2023, the mother filed a handwritten "motion for a rehearing" in which she averred that she had shown up for court

9

one day late and set forth several reasons for her confusion regarding the correct date for the pendente lite hearing on January 9, 2023. The juvenile court denied that motion on January 12, 2023.

The mother continued to post on social media about the child, and some of those posts threatened anyone she believed might be supporting the stepfather's claim seeking custody of the child and/or assisting the stepfather in caring for the child. On January 29, 2023, the child received another series of angry messages from the mother in which she criticized the child, the child's grades, and the fact that that child was living with the stepfather. In those messages, the mother used abusive language and said, among other things, that she "could not have asked for a worse [child]," and that she was disowning the child. The stepfather testified that the child was distressed when he received those messages. The stepfather informed the child's guardian ad litem about the mother's January 29, 2023, messages to the child, and the child's guardian ad litem agreed with the stepfather that the child should "block" the mother's ability to message him. At approximately that same time, the mother began directing abusive messages and social-media posts toward a mother of a child who was on the child's baseball team.

The stepfather also testified that the mother had made numerous unsuccessful attempts to contact the child in late December 2022 and January 2023 either by text or through a social-media platform.[1] He stated that the mother's attempts to communicate with the child were intermittent for a brief period after January 2023, but that the number of those attempts increased in March 2023 and April 2023, around the time of the child's birthday.

On February 22, 2023, the stepfather filed a motion seeking to have the mother held in contempt for, among other things, continuing to attempt to contact the child in violation of the pendente lite custody order and for failing to enroll in color-code drug screening. On February 23, 2023, the juvenile court entered an order in which it scheduled a hearing on the contempt motion and ordered the mother to begin complying with its orders, including the pendente lite custody order that prohibited her from contacting the child.

The stepfather testified that he had been active in taking care of the child during the parties' marriage, and, he said, in the last few years,

---

[1]The stepfather did not explain how he learned that the mother had attempted to contact the child.

he had been the child's primary caretaker. He stated that because of the mother's mental illness, he had been the one to take the child to doctor's and orthodontist's appointments and that he had attended all of the child's school or extra-curricular events and meetings. According to the stepfather, the mother receives approximately $880 per month in Social Security disability benefits, she earns approximately $1,500 per month as an aesthetician, and he gives her $185 per week; it is not clear whether the weekly payment from the stepfather is a pendente lite amount of alimony ordered as a part of the divorce action pending between the parties. The stepfather was unaware whether the mother receives any form of financial support for the child from the child's father. He stated that the mother had made no contribution toward the support of the child during the time the child has been living with him.

The child's maternal grandfather, R.S.B. ("the maternal grandfather"), testified that he traveled from his home in St. Petersburg, Florida, to testify in support of the stepfather's claim seeking custody of the child. The maternal grandfather described witnessing behaviors by the mother that were similar to those that had been described by the stepfather in his testimony and evidenced by the exhibits submitted into

evidence as a part of the dependency action. The maternal grandfather did not believe that the child would be safe in the mother's custody. He testified that the stepfather and the child have a great, supportive relationship and that he had no concerns about the stepfather's ability to care for the child. The maternal grandfather testified that he and the stepfather work well together and that he had enjoyed a visit that the child had made to Florida to visit him over the summer.

The stepfather's attorney briefly testified to establish that the stepfather was seeking an award of $4,000 as an attorney fee because of the mother's failure to comply with discovery and her failure to comply with the PFA order; the attorney indicated that that fee was reasonable under the circumstances of this litigation. Also, at the close of the dependency hearing, the child's guardian ad litem recommended that the stepfather be awarded custody of the child and that the mother have no contact with the child.

At the end of the May 9, 2023, dependency hearing, the juvenile court announced that it found the child dependent and that it would award custody of the child to the stepfather. The juvenile court also stated that, because of the tone of the mother's recent threatening

13

messages, any visitation between the child and the mother would be detrimental to the child. However, the juvenile court reminded the parties that its decision could be modified when the mother returned to mental-health counseling and appropriately addressed her mental-health issues; it noted that the mother could then filed a petition seeking to modify the custody or visitation provisions of the written judgment it would enter.

On May 11, 2023, although the mother was represented by counsel, she filed in the juvenile court a pro se, handwritten motion that, in substance, was a postjudgment motion requesting a new trial.[2] In that motion, the mother stated that her telephone had broken and that it was an "honest mistake" that she had missed the May 9, 2023, dependency hearing; she requested that the juvenile court conduct another hearing on the issue of the child's dependency.

On May 16, 2023, the juvenile court entered a judgment in which it found the child dependent, awarded custody of the child to the stepfather,

---

[2]The mother has made no argument that that motion should be interpreted in any other manner or that it was a motion to continue. Accordingly, any such argument is waived. See Ex parte Riley, 464 So. 2d 92, 94 (Ala. 1985) ("[F]ailure to argue an issue in [a] brief to an appellate court is tantamount to the waiver of that issue on appeal.").

14

ordered the mother to pay child support, and specified that the mother have no visitation or contact with the child. In that judgment, the juvenile court also determined that the mother was in contempt for her failure to comply with certain of its orders during the pendency of the dependency action.

Also on May 16, 2023, the juvenile court, the juvenile court entered an order denying the mother's May 11, 2023, postjudgment motion. See Taylor v. Methodist Home for Aging, [Ms. SC-2022-0681, May 12, 2023] ___ So. 3d ___, ___ (Ala. 2023) (explaining that a postjudgment motion filed before the entry of the final judgment was deemed effective on the date the final judgment was entered); and New Addition Club, Inc. v. Vaughn, 903 So. 2d 68, 72 (Ala. 2004) ("[A] postjudgment motion filed before a judgment is entered is not a nullity; it becomes effective when the judgment is entered."). The mother filed a timely notice of appeal to this court on May 17, 2023.

The mother raises on appeal arguments challenging the sufficiency of the evidence supporting the juvenile court's custody and visitation awards and its finding that she was in contempt. With regard to those

15

issues, in its May 16, 2023, judgment, the juvenile court made the following factual findings:

"5. Testimony was presented that the mother has extensive mental-health issues, including being diagnosed with schizoaffective disorder and bipolar disorder. The evidence and testimony presented demonstrated that the mother has failed to maintain her prescribed medications. The mother's untreated mental health has resulted in the mother demonstrating behaviors that endanger herself and others, which include, but are not limited to: self-medicating; transient behavior; paranoia; grandiose behavior including referencing herself as 'God' and being a prophetess, promiscuity, and extreme social-medial outbursts and verbal tirades directed toward others. The mother has failed to maintain housing and is now residing with her second paramour since the filing of this action. Certified probate-court records were introduced that the mother was committed [to a hospital or other facility for psychiatric treatment] in 2019 and 2021 for exhibiting similar behavior.

"6. The court finds that the mother's disregard for maintaining her mental-health treatment and/or taking her medications as prescribed have directly and negatively impacted this minor child. The minor child has been removed from multiple sports teams and activities due to the mother's erratic and abusive behavior with other adults and coaches involved therein. The mother's behaviors have resulted in the minor child being ostracized from other stable and positive influences in his life. The court finds, from the evidence and testimony, that the only stability this minor child has had in his life for many years is the [stepfather]. The [stepfather] has, for the last ten (10) years, provided for the minor child's emotional, educational, extracurricular, and medical needs, including providing the minor child with a safe, stable, and loving home.

16

"7. The court finds that the mother has, throughout the pendency of this matter, continuously violated the orders of this court. The evidence and testimony presented indicated that the mother has contacted the minor child in violation of the no-contact order and that she has failed to comply with the court's order that she immediately enroll in color-code drug and alcohol testing. The evidence and testimony submitted to the court included a barrage of text messages sent from the mother to the minor child wherein the mother repeatedly told the minor child that she disowned him and that she could not have picked a worse son."

We first address the mother's contention that the juvenile court erred in finding the child dependent. Under the Alabama Juvenile Justice Act, § 12-15-101 et seq., Ala. Code 1975, a "dependent child" is

"[a] child who has been adjudicated dependent by a juvenile court and is in need of care or supervision and meets any of the following circumstances:

"....

6. Whose parent, legal guardian, legal custodian, or other custodian is unable or unwilling to discharge his or her responsibilities to and for the child.

"'....

"8. Who, for any other cause, is in need of the care and protection of the state."

§ 12-15-102(8)a., Ala. Code 1975.

A dependency determination must be supported by clear and convincing evidence. § 12-15-310, Ala. Code 1975. "Clear and convincing

17

evidence" is "'[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.'" L.M. v. D.D.F., 840 So. 2d 171, 179 (Ala. Civ. App. 2002) (quoting § 6-11-20(b)(4), Ala. Code 1975). "[M]atters of dependency are within the sound discretion of the [juvenile] court, and a [juvenile] court's ruling on a dependency action in which evidence is presented ore tenus will not be reversed absent a showing that the ruling was plainly and palpably wrong." J.S.M. v. P.J., 902 So. 2d 89, 95 (Ala. Civ. App. 2004).

In her argument submitted to this court, the mother does not appear to dispute that, in the past, her conduct was such as to render the child dependent. However, she argues that the evidence at the May 9, 2023, dependency hearing focused on her "past behaviors," and that the record was devoid of evidence of the mother's condition and circumstances at the time of the dependency hearing. As the mother argues, a juvenile court's determination of whether a child is dependent "must be based on [a parent's] current circumstances." C.S. v. Morgan

Cnty. Dep't of Hum. Res., [Ms. CL-2022-1246, Jan. 31, 2024] ___ So. 3d ___, ___ (Ala. Civ. App. 2024).

In C.S., supra, at the time of the final haring, the mother was making efforts to adjust her circumstances to meet the child's needs, and, as part of those efforts, she was attending a mental-health-rehabilitation program at which she resided. However, that program would not allow the child at issue in C.S. to live with the mother, and evidence supported the conclusion that the mother had not yet completed the rehabilitation program or sufficiently overcome or addressed her mental-health issues. Therefore, this court affirmed the judgment finding the child dependent as to the mother. C.S., ___ So. 3d at ___.

We agree with the mother that much of the evidence presented to the juvenile court related to the mother's behaviors occurring in 2019 and 2021. That evidence tended to establish a pattern in the mother's behavior when she was not properly seeking mental-health treatment and complying with her prescription-medication regimen. It was presented to establish that that mother was demonstrating similar behavior in 2022 and 2023 and, therefore, that she was not complying with her mental-health treatment. The stepfather presented evidence

regarding the mother's conduct in the second half of 2022 that was reflective of her behaviors in the past. In addition, he testified that that conduct had continued into 2023. For example, on January 29, 2023, only two months before the dependency hearing, the mother sent a series of messages to the child in which she criticized the child and told him that he was no longer her son. The stepfather also testified that the mother had continued to attempt to contact the child in March and April 2023 in violation of the no-contact order.

The mother has cited to no supporting case law for a proposition that the stepfather's evidence concerning her behaviors from the summer of 2022 through March and April 2023 was too remote in time to support the juvenile court's May 16, 2023, dependency determination based on the mother's current circumstances. There is no established formula for or time limitation on the determination of what constitutes "current circumstances" in the context of a dependency action. The juvenile court noted that the mother's grandiose and sometimes threatening behaviors and outbursts had continued during the pendency of the dependency action. The mother presented no evidence to challenge the evidence presented by the stepfather. Given the specific facts of this case, we

20

cannot say that the mother has demonstrated that, in finding the child dependent, the juvenile court failed to consider her current circumstances.

As a separate part of her argument on this issue, the mother also contends that the juvenile court could not find the child dependent because the child's father was not served in the dependency action. We note that the stepfather testified that he did not know the whereabouts of the child's father, except that he had last heard that the father was living in Virginia. Regardless, the mother may not assert arguments on behalf of a third party. B.M. v. Jefferson Cnty. Dep't of Hum. Res., 183 So. 3d 157, 160 (Ala. Civ. App. 2015) (rejecting a mother's argument that a judgment terminating her parental rights was erroneous because the children's father had not been properly served); see also Ex parte Izundu, 568 So. 2d 771, 772 (Ala. 1990); K.S. v. K.P., 372 So. 3d 549, 551 (Ala. Civ. App. 2022).

The mother also challenges that part of the May 16, 2023, judgment that suspended her visitation and contact with the child.

> "It is well settled that a trier of fact has broad discretion to determine a parent's right to visitation with a dependent child and that the best interests and welfare of the child is the

primary consideration in determining whether to award visitation and, if so, the extent of that visitation."

Y.N. v. Jefferson Cnty. Dep't of Hum. Res., 67 So. 3d 76, 82 (Ala. Civ. App. 2011). As the mother recognizes, a juvenile court may place restrictions on a parent's visitation with a dependent child. C.O. v. S.O., 85 So. 3d 460, 465-66 (Ala. Civ. App. 2011). Any restrictions on a noncustodial parent's visitation should constitute the least restrictive means to protect the child and his or her best interests. K.D. v. Jefferson Cnty. Dep't of Hum. Res., 88 So. 3d 893, 897 (Ala. Civ. App. 2012).

In C.O. v. S.O., supra, this court explained:

"[T]he juvenile court's discretion in awarding visitation 'should be exercised with a view towards the policy of preserving relationships between parents and children whenever possible.' M.R.D. v. T.D., 989 So. 2d 1111, 1118 (Ala. Civ. App. 2008) (concluding that, given the facts of that case, the suspension of visitation was 'overly restrictive'). This court has held that 'the trial court may not use an overbroad [visitation] restriction that does more than necessary to protect the child.' Pratt v. Pratt, 56 So. 3d [638,] 641 [(Ala. Civ. App. 2010)]. As always, the primary consideration in determining a noncustodial parent's visitation rights is the best interests of the child; our supreme court has recently reiterated that '[a] trial court in establishing visitation privileges for a noncustodial parent must consider the best interests and welfare of the minor child and, where appropriate, as in this case, set conditions on visitation that protect the child.' Ex parte Thompson, 51 So. 3d 265, 272 (Ala. 2010)."

22

85 So. 3d at 466. Any limitation on a parent's rights of visitation with his or her child "must be supported by evidence that the misconduct of the parent is detrimental to the child." Carr v. Broyles, 652 So. 2d 299, 304 (Ala. Civ. App. 1994).[3]

In Minchew v. Mobile County Department of Human Resources, 504 So. 2d 310, 311 (Ala. Civ. App. 1987), the juvenile court suspended the mother's visitation with her child, and this court affirmed, noting, among other things, that the denial of visitation is permissible if the evidence shows that it is in the child's best interests. In another case, this court affirmed an award of supervised visitation with a child when "the juvenile court reasonably could have determined from the evidence in the record that the mother had routinely placed the child in harm's way by allowing criminal and dangerous activity to occur in the presence of the child." K.D. v. Jefferson Cnty. Dep't of Hum. Res., 88 So. 3d 893, 898 (Ala. Civ. App. 2012).

---

[3]We note that the standard for the determination of an award of visitation with a dependent child is the same standard as that applied in awarding visitation in a divorce action. K.D. v. Jefferson Cnty. Dep't of Hum. Res., 88 So. 3d 893, 897 (Ala. Civ. App. 2012) (citing R.B.O. v. Jefferson Cnty. Dep't of Hum. Res., 70 So. 3d 1286, 1288-91(Ala. Civ. App. 2011).

The record on appeal contains evidence indicating that the child has been distressed by the mother's contacts with him, has been embarrassed by her volatile outbursts, and that certain coaches and parents have elected to remove the child from a team rather than continue to be exposed to the mother. "This court has held that a noncustodial parent's visitation rights may be restricted '"in order to protect children from conduct, conditions, or circumstances surrounding their noncustodial parent that endanger the children's health, safety, or well-being."'" Wells v. Tankersley, 244 So. 3d 975, 984 (Ala. Civ. App. 2017) (quoting B.F.G. v. C.N.L., 204 So. 3d 399, 404 (Ala. Civ. App. 2016), quoting in turn Pratt v. Pratt, 56 So. 3d 638, 641 (Ala. Civ. App. 2010)). The juvenile court explicitly determined that the mother's failure to adequately manage her mental-health conditions have "directly and negatively" impacted the child. Thus, the juvenile court concluded that the mother's conduct had had such a detrimental effect on the child that suspending her visitation and contact with the child would serve the child's best interests. Carr v. Broyles, supra; see also Lester v. Lester, [Ms. 2210282, Dec. 22, 2022] ___ So. 3d ___, ___ (Ala. Civ. App. 2022) ("Although we do not hold that a trial court cannot place limits on a parent's visitation

24

unless the children involved have first suffered harm a result of the parent's misconduct, the record must disclose that the limitations imposed on a parent's visitation are to protect the children from anticipated harm resulting from the noncustodial parent's behavior."); and <u>Laurent v. Laurent</u>, 434 So. 2d 266, 268-69 (Ala. Civ. App. 1983) (affirming a judgment that, in part, temporarily suspended a mother's visitation "so that an effort could be made to improve the child's emotional health and to eliminate the harmful conflicts between the grandparents and the mother"). Given the evidence in the record concerning the mother's behaviors, we conclude that the evidence supports the juvenile court's determination regarding suspending the mother's visitation and that the mother has failed to show error with regard to this issue.

The mother also contends that the suspension of her right to visit or contact the child is the equivalent to a termination of her parental rights. This court has considered a similar argument and rejected it. <u>See</u> <u>Y.N. v. Jefferson Cnty. Dep't of Hum. Res.</u>, supra. In reaching its holding in <u>Y.N.</u>, this court stated that the mother could seek to modify the judgment that denied or suspended her claim for visitation. <u>Y.N.</u>, 67 So.

3d at 83-84. Similarly, as the juvenile court noted at the end of the May 9, 2023, dependency hearing, the mother in this case can seek a modification of the May 16, 2023, judgment if she seeks appropriate mental-health treatment and maintains that treatment such that her behaviors are controlled and appropriate. The mother is incorrect that the current suspension of her visitation and contact with the child constitutes a termination of her parental rights. Y.N., supra.

The mother next argues that the juvenile court erred in finding her in contempt. Rule 70A, Ala. R. Civ. P., governs a claim or action alleging contempt. In its judgment, the juvenile court determined the mother to have been in constructive, civil contempt of its orders. "'Civil contempt' means willful, continuing failure or refusal of any person to comply with a court's lawful writ, subpoena, process, order, rule, or command that by its nature is still capable of being complied with." Rule 70A(a)(2)(D), Ala. R. Civ. P. Under Rule 70A, the concept of mitigation specifically pertains to a finding of direct contempt. Rule 70A(b)(2), Ala. R. Civ. P. "Direct contempt" is defined as:

> "disorderly or insolent behavior or other misconduct committed in open court, in the presence of the judge, that disturbs the court's business, where all of the essential elements of the misconduct occur in the presence of the court

26

and are actually observed by the court, and where immediate action is essential to prevent diminution of the court's dignity and authority before the public."

Rule 70A(a)(2)(A), Ala. R. Civ. P. In contrast, a "constructive contempt" means "any criminal or civil contempt other than a direct contempt." Rule 70A(a)(2)(B).

Our courts have applied the concept of mitigation to constructive contempt claims.

"In considering whether a lower court complied with the requirements of due process in a case of constructive or indirect contempt, we look to determine if the following elements were present: (1) notice of the charges; (2) reasonable opportunity to meet them; (3) right to call witnesses; (4) right to confront the accuser; (5) right to give testimony relevant either to the issue of complete exculpation or extenuation of the offense; and (6) right to offer evidence in mitigation of the penalty imposed."

Fludd v. Gibbs, 817 So. 2d 711, 713 (Ala. Civ. App. 2001). See also Charles Mfg. Co. v. United Furniture Workers, 361 So. 2d 1033, 1037 (Ala. 1978); Kimbrough v. Kimbrough, 963 So. 2d 662, 665 (Ala. Civ. App. 2007).

The mother briefly asserts on appeal that under Rule 70A, she was entitled to due process and an evidentiary hearing. Out of an abundance of caution, we interpret that statement as arguing that she was denied due process with regard to the contempt claim. The mother has not

27

identified any of the six elements listed above that she contends were not provided to her in the juvenile court. In fact, our review of the record indicates that the mother had notice of the contempt claim and an opportunity at the final hearing to call witnesses, confront her accuser, to provide her own testimony, and to present evidence of any applicable mitigating circumstances. The mother's failure to appear at the dependency hearing, at which the juvenile court considered the contempt claims, did not operate to deprive the mother of her due-process rights. Further, the mother was represented by an attorney at the dependency hearing and was provided with the opportunity to present evidence in opposition to the dependency claim.

In her appellate brief, the mother does not argue that her actions in failing to enroll in color-code drug screening and in continuing to contact the child did not violate the juvenile court's orders. Instead, the mother contends that the juvenile court should have considered her mental-health conditions as rendering her unable to comply with its orders and the grant of her status as an indigent litigant as evidence of her inability to pay the stepfather's attorney fee as a part of the contempt sanction. The mother impermissibly raises those arguments for the first

28

time on appeal. See Andrews v. Merritt Oil Co., 612 So. 2d 409, 410 (Ala. 1992) ("[An appellate court] cannot consider arguments raised for the first time on appeal; rather, [an appellate court's] review is restricted to the evidence and arguments considered by the trial court.").

However, out of an abundance of caution, we note that the language of the juvenile court's judgment fully supports the determination that it was aware of the mother's mental-health conditions. The juvenile court's judgment implies that it concluded that, even with the impact of her mental-health condition, the mother was capable of understanding and complying with court orders. The evidence that the mother is capable of working and earning income as an aesthetician supports that determination. With regard to her ability to pay the contempt sanction, in her affidavit of substantial hardship filed in the juvenile court, the mother represented that her total monthly income was $1,000 per month.[4] In support of his child-support claim, the stepfather testified that the mother received approximately $2,380 in earnings and disability income, and that she receives another $185 per week from the stepfather.

---

[4]The figures the mother listed with regard to various types of income totaled more than $1,000 per month, but the "total monthly gross income" listed by the mother in applying for indigency status was $1,000.

No evidence before the juvenile court indicated that the mother was unable to comply with the juvenile court's orders. Accordingly, given the evidence in the record and the discretion to be afforded the juvenile court, we cannot say that the juvenile court erred in reaching its contempt determination. See Poh v. Poh, 64 So. 3d 49, 61 (Ala. Civ. App. 2010) ("The issue whether to hold a party in contempt is solely within the discretion of the trial court, and a trial court's contempt determination will not be reversed on appeal absent a showing that the trial court acted outside its discretion or that its judgment is not supported by the evidence.").

As a final issue, the mother challenges the juvenile court's determination of her child-support obligation. In Alabama, the determination of a non-custodial parent's child-support obligation is governed by the Rule 32, Ala. R. Jud. Admin., child-support guidelines. Shook v. Shook, [Ms. 2210161, Apr. 28, 2023] ___ So. 3d ___, ___ (Ala. Civ. App. 2023); Wells v. Tankersley, 244 So. 3d 975, 985 (Ala. Civ. App. 2017). In order to assist a juvenile court or other trial court in calculating the appropriate amount of child support, the parties are required by the child-support guidelines to submit certain forms in any action involving

a claim for child support. Specifically, Rule 32(E), Ala. R. Jud. Admin., requires that each party file:

> "A standardized Child-Support Guidelines form (Form CS-42 or Form CS-42-S as appended to this rule), a Child-Support-Obligation Income Statement/Affidavit form (Form CS-41 as appended to this rule), and a Child-Support Guidelines Notice of Compliance form (Form CS-43 as appended to this rule) shall be filed in each action to establish or modify child-support obligations and shall be of record and shall be deemed to be incorporated by reference in the court's child-support order."

Compliance with Rule 32(E) is mandatory, and the failure to comply with that rule can be a basis for reversing a child-support judgment. Martin v. Martin, 637 So. 2d 901, 903 (Ala. Civ. App. 1994); J.M. v. D.V., 877 So. 2d 623, 630 (Ala. Civ. App. 2003). However, if this court can discern from the evidence in the record the manner in which the juvenile court or trial court calculated child-support determination, we may affirm the child-support award. Hayes v. Hayes, 949 So. 2d 150, 154 (Ala. Civ. App. 2006); Devine v. Devine, 812 So. 2d 1278, 1282-83 (Ala. Civ. App. 2001).

In this case, the stepfather submitted to the juvenile court a Form CS-41 income affidavit for himself and a Form CS-42 child-support-guidelines form in which he represented, among other things, that the mother's gross monthly income was $3,265. The mother did not submit

31

into evidence any of the forms required by Rule 32(E). At the final hearing, the stepfather testified that the mother received $880 per month in disability benefits, that she earned $1,500 per month in income, and that he paid her $185 per week; it is not clear whether the weekly payment to the mother is a form of alimony or a gift. See Rule 32(B)(2)(a), Ala. R. Jud. Admin. ("Gross income" for the purposes of the child-support guidelines includes, among other things, income from gifts or a preexisting award of periodic alimony).

> "'"The trial court is not bound by the income figures advanced by the parties, and it has discretion in determining a parent's gross income. However, '"[t]his court cannot affirm a child-support order if it has to guess at what facts the trial court found in order to enter the support order it entered...."' Willis v. Willis, 45 So. 3d 347, 349 (Ala. Civ. App. 2010) (quoting Mosley v. Mosley, 747 So. 2d 894, 898 (Ala. Civ. App. 1999))." Morgan v. Morgan, 183 So. 3d 945, 961 (Ala. Civ. App. 2014).'"

Wells v. Tankersley, 244 So. 3d at 986 (quoting Walker v. Lanier, 221 So. 3d 470, 473-74 (Ala. Civ. App. 2016)).

The amounts of the mother's income to which the stepfather testified during the final hearing do not total the $3,265 of gross monthly income set forth in the stepfather's Form CS-42, upon which the juvenile court relied in reaching its child-support determination. We are unable to determine from the record the manner in which the juvenile court

could have reached its determination of the mother's gross monthly income for the purposes of calculating her child-support obligation. For that reason, we reverse the child-support award and remand the cause for the juvenile court to redetermine child support in compliance with the Rule 32 child-support guidelines. Johnson v. Johnson, 372 So. 3d 1217, 1222 (Ala. Civ. App. 2022); Cate v. Cate, 370 So. 3d 560, 566 (Ala. Civ. App. 2022); Walker v. Lanier, 221 So. 3d at 473-74.

We affirm the juvenile court's judgment with regard to the issues of custody, visitation, and contempt. We reverse that part of the juvenile court's judgment concerning the award of child support, and we remand the cause for the redetermination of the mother's child-support obligation.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

Edwards, Fridy, and Lewis, JJ., concur.

Moore, P.J., concurs in the result, without opinion.